EVAN FINKEL (SBN 100673)
evan.finkel@pillsburylaw.com
MICHAEL S. HORIKAWA (SBN 267014)
michael.horikawa@pillsburylaw.com
CHAZ M. HALES (SBN 324321)
chaz.hales@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone: (213) 488-7100
Facsimile No.: (213) 226-4058

Attorneys for Plaintiff
MicroVention, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICROVENTION, INC., a Delaware corporation,<br><br>               Plaintiff,<br><br>   vs.<br><br>BALT USA, LLC, a Delaware Limited Liability Company,<br><br>               Defendant. | Case No.<br><br>**PLAINTIFF MICROVENTION, INC.'S COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff MicroVention, Inc., by and through its attorneys, hereby brings its Complaint against Defendant Balt USA, LLC, and alleges as follows:

## INTRODUCTION

1.     This is a civil action seeking monetary damages and injunctive relief under federal law based upon the infringement by Defendant Balt USA, LLC ("Balt") of patents owned by Plaintiff MicroVention, Inc. ("MicroVention"). This Court has subject matter jurisdiction over MicroVention's federal patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2.      MicroVention is an innovative medical device company founded in Southern California in 1997, to improve the treatment of diseases in small blood vessels. MicroVention's first commercial product was a line of platinum microcoil implants used to treat brain aneurysms and approved for commercial use in 2001. Although MicroVention's pioneering work has since led to the development of more than thirty products to combat a host of other diseases, including ischemic stroke and carotid artery disease, microcoil implants for the treatment of brain aneurysms remain central to MicroVention's mission.

3.      A brain aneurysm is a weak or thin spot on a blood vessel wall in the brain that balloons out and fills with blood. When a brain aneurysm bursts, blood spills into the surrounding brain tissue. Without medical intervention, this blood accumulates and compresses the surrounding tissue, depriving brain cells of necessary oxygen and causing cell and tissue damage, a condition called hemorrhagic stroke.

4.      One way to treat a brain aneurysm before it bursts is by delivering implants in the form of detachable metal coils referred to as "microcoils" into the aneurysm in order to fill the aneurysm, prevent new blood flow into the aneurysm, and eventually cause the existing blood to clot inside the aneurysm (a process referred to as embolization). In order to deliver a detachable coil to an aneurysm, a surgeon will insert a catheter into one of the patient's arteries, typically the femoral artery near the groin, and use angiography to guide the catheter through the artery to the site of the aneurysm. Once the catheter is in place, the surgeon can then deliver an implant, such as a detachable microcoil, to the aneurysm by pushing the implant through the catheter using a long flexible device called a "pusher." MicroVention's patented delivery system is called V-Trak®.

5.      Microcoils are tiny, extremely flexible, spring-like structures. In order to make them easier to reposition and, if necessary, retrieve without becoming stretched and losing their shape, recent efforts have been directed to making them stretch-

2

resistant. To achieve this goal, MicroVention uses an internal monofilament tether tied to both ends of the implant coil that makes the coil stretch-resistant.

6.     The same tether is also used to hold the implant coil at the end of the pusher, itself a long, hollow, flexible coil. MicroVention sells its range of microcoils pre-attached to the V-Trak delivery system pusher in a single package, ready for immediate use by a surgeon.

7.     In order to sever the tether and detach the implant from the pusher, a tiny resistive heating device is installed at the tip of the V-Trak pusher. On the press of a button from the surgeon, the heater is activated, and the slender monofilament tether is severed in less than 1 second. The implant stays in place in the aneurysm while the pusher is retracted and removed from the patient's body.

8.     The V-Trak delivery system is designed for use with MicroVention's V-Grip® detachment controller, which the surgeon uses to control and power the heater that detaches the implant from the pusher. Using a heater to quickly sever the tether that connects the implant and pusher is an innovation that provides significant advantages over other detachment methods.

9.     MicroVention has successfully patented the technology for its V-Trak delivery system and V-Grip detachment controller for use in delivering implants to the site of an aneurysm. These patents are the subject of this action.

10.    On information and belief, Defendant Balt began as a company called Blockade Medical, LLC ("Blockade"). On information and belief, Blockade was founded in California in 2011 by, among others, David Ferrera ("Ferrera"), who now serves as Balt's President and Chief Operating Officer. Ferrera was employed by MicroVention from about July 1999 to August 2007, first as Senior Research and Development Manager and later as Director of Clinical Research.

11.    On information and belief, other former MicroVention employees joined Ferrera at Blockade and now occupy key roles at Balt. Ryan Solomon, formerly a Senior Product Manager at MicroVention, is Balt's current Vice President of

3

Marketing. Nguyen ("Jake") Le, a former MicroVention Senior Research and Development Engineer employed by MicroVention from about May 2008 to November 2011—who worked on MicroVention's coil technology including, V-Trak technology research, development, and manufacturing—is Balt's current Director of Research and Development.  Yoshi Katayama, a former MicroVention Sr. Process Development Engineer and Engineering Manager, V-Trak Advanced employed by MicroVention from about August 2011 to March 2018 —who worked on MicroVention's V-Trak technology – is Balt's current Process Engineering Manager.

12.     Ferrera, Solomon, Le and Katayama all were employed by MicroVention during a period of time that MicroVention was prosecuting applications on the technology leading to issuance of the four U.S. Patents that are the subject of this Complaint - U.S. Patent Nos. 8,182,506, 9,414,819, 9,717,500 and 10,076,338. Katayama was employed by MicroVention during a period of time that three of those U.S. Patents issued - U.S. Patent Nos. 8,182,506, 9,414,819, and 9,717,500.   On information and belief, at least Ferrera, Le and Katayama knew that MicroVention was prosecuting such applications during their employment at MicroVention.

13.     On information and belief, Blockade's only commercial product was a platinum coil system for treating brain aneurysms called Barricade, first approved by the FDA for sale in 2013. Attached as Exhibit F is a true and correct copy of a letter and related documentation dated March 28, 2013, regarding FDA approval of Blockade's Section 510(k) premarket notification of intent to market the Barricade Embolization Coil System available online at https://www.accessdata.fda.gov/cdrh_docs/pdf12/K123338.pdf ("FDA 510(k) application for Barricade"). Blockade's FDA 510(k) application for Barricade identifies the MicroVention "Microplex Coil System (K093358)" as one of the "Predicate Devices" and states that Barricade "is substantially equivalent in intended use, principal of operation and technological characteristics to … the Microplex Coil System (K093358)." However, the FDA 510(k) application also notes that while the

4

Microplex Coil System uses a "V-Grip Detachment Controller" and "Thermo-mechanical" "Coil detachment," Barricade uses different detachment equipment and "Electrolytic" "Coil detachment." Thus, on information and belief, unlike the MicroVention products that had already been available for years, Barricade did not use thermal detachment to separate the microcoil implant from the delivery pusher. On information and belief, instead, Barricade had its own technology called "electrolytic detachment," a process whereby a chemical reaction causes the connection between the implant and pusher to slowly dissolve. Patents owned by Blockade explain that the electrolytic detachment process takes around 10 seconds, an order of magnitude longer than MicroVention's sub-1 second thermal detachment technology.

14.    On information and belief, in 2016, Blockade was acquired by French company Balt International. On information and belief, following the acquisition, Blockade was rebranded as Balt USA, LLC.

15.    On information and belief, in 2018, Balt was granted FDA approval to market a new implant coil and delivery system called the Optima Coil System ("Optima"). Attached as Exhibit G is a true and correct copy of a letter and related documentation dated February 18, 2018, regarding FDA approval of Balt's Section 510(k) premarket notification of intent to market the Optima Coil System available online at https://www.accessdata.fda.gov/cdrh_docs/pdf17/K172390.pdf ("FDA 510(k) application for Optima"). Unlike the Barricade system it had previously been selling that used the slower electrolytic detachment technology, Balt's new Optima product uses the same faster thermal detachment technology described in MicroVention's patents and already available in MicroVention's MicroPlex Coil System with V-Trak delivery system and V-Grip detachment controller.  Balt's FDA 510(k) application for Optima indicates that transitioning from electrolytic to thermal detachment required Balt to make changes to every part of their coil and delivery system, including changing the tether that connects the implant and pusher, redesigning the pusher to include a resistive heater coil at its tip, and developing a completely

5

different detachment controller called the XCEL Detachment Controller. On information and belief, emphasizing the importance of the improved Optima products, former MicroVention employee and current Balt President David Ferrera said, "Balt paid $42.5M to acquire Blockade. That value was essentially for the Optima Coil system."

16.   On information and belief, to create its Optima product, Balt directly copied MicroVention's V-Trak delivery system and V-Grip detachment controller and infringed MicroVention's patents that describe this technology. On information and belief, by copying the faster thermal detachment system to replace the much slower electrolytic detachment system, the performance of Balt's Optima Coil System improved by an order of magnitude. Balt even copied MicroVention's "MicroPlex coil system with V-Trak Delivery System Instructions for Use", using large portions verbatim, as seen in the Optima Coil System Instructions For Use, highlighted and attached as Exhibit A.

17.   Balt's Optima Coil System embodies or uses the inventions claimed in at least claim 1 of U.S. Patent No. 8,182,506 ("the '506 Patent"), claim 1 of U.S. Patent No. 9,414,819 ("the '819 Patent"), claim 1 of U.S. Patent No. 9,717,500 ("the '500 Patent"), and claim 1 of U.S. Patent No. 10,076,338 ("the '338 Patent") (collectively, the "MicroVention Patents").

18.   Balt has actual knowledge of the MicroVention Patents at least as of the date of this Complaint.  On information and belief, based on the allegations set forth in the preceding paragraphs, including without limitation the following allegations, Balt also had actual knowledge of the MicroVention Patents at the time Balt's infringement commenced and throughout its continued infringement of the MicroVention Patents or, in the alternative, remained willfully blind to the existence of the MicroVention Patents:

(a) Balt's Founder, President and Chief Operating Officer is David Ferrera, MicroVention's former Senior Research and Development Manager and former

Director of Clinical Research.  Ferrera was employed by MicroVention during a period of time that MicroVention was prosecuting applications on the technology leading to issuance of the MicroVention Patents.  Ferrera knew that MicroVention was prosecuting such applications during his employment at MicroVention.

(b) Balt's Director of Research and Development is Jake Le, MicroVention's former Senior Research and Development Engineer who worked on MicroVention's coil technology including, V-Trak technology research, development, and manufacturing.  Le knew that MicroVention was prosecuting such applications during his employment at MicroVention.

(c) Balt's Vice President of Marketing is Ryan Solomon, MicroVention's former Senior Product Manager.  Solomon was employed by MicroVention during a period of time that MicroVention was prosecuting applications on the technology leading to issuance of the MicroVention Patents.

(d) Balt's Processing Engineering Manager is Yoshi Katayama, MicroVention's former Sr. Process Development Engineer and former Engineering Manager, V-Trak Advanced.  Katayama was employed by MicroVention during a period of time MicroVention was prosecuting applications on the technology leading to issuance of the MicroVention Patents, and during which three of the MicroVention Patents issued – the '506 Patent, the '819 Patent, and the '500 Patent.

(e) Balt switched from its inferior electrolytic detachment system to MicroVention's superior thermal detachment system by copying MicroVention's patented system.

(f) Balt copied MicroVention's "MicroPlex coil system with V-Trak Delivery System Instructions for Use", using large portions verbatim, as seen in the Optima Coil System Instructions For Use.

## **THE PARTIES**

19.    Plaintiff MicroVention is a Delaware corporation having its principal place of business in Aliso Viejo, California.

7

20.　　On information and belief, Defendant Balt is a Delaware limited liability company principally engaged in the design, manufacture, and sale of medical devices and having its principal place of business at 29 Parker, Irvine, CA 92618, located in this judicial district.

## JURISDICTION AND VENUE

21.　　This Court has subject matter jurisdiction over MicroVention's federal patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

22.　　This Court has personal jurisdiction over Balt because it is headquartered and has its principal place of business in Irvine, California, in this district. Further, Balt regularly conducts business through its place of business in Irvine, California, in this district, where it has committed and continues to commit acts of infringement in violation of 35 U.S.C. § 271.

23.　　Venue is proper in this district under 28 U.S.C. § 1400(b) because Balt is a limited liability company with its principal place of business in Irvine, California, in this district, and thus Balt resides in this district. Venue is also proper in this district under 28 U.S.C. § 1400(b) because Balt has committed acts of infringement in this district and has a regular and established place of business in Irvine, California, in this district.  Balt's infringing acts in this district include the manufacture of the Optima Coil System at its headquarters in Irvine, California.  According to a March 28, 2018 Balt press release at https://balt-usa.com/news/balt-usa-llc-announces-510k-clearance-of-the-optima-coil-system-and-new-balt-usa-headquarters/, "The Optima Coil System is one [of the] first products being manufactured at Balt USA's new 60,000 square foot headquarters in Irvine, California."

4825-3910-3132.v1

## THE ASSERTED MICROVENTION PATENTS

24.    U.S. Patent No. 8,182,506 ("the '506 Patent"), entitled "Thermal Detachment System for Implantable Devices," was duly and legally issued on May 22, 2012, and names Matthew Fitz and Joseph Gulachenski as the inventors. A true and correct copy of the '506 Patent is attached as Exhibit B.

25.    U.S. Patent No. 9,414,819 ("the '819 Patent"), entitled "Thermal Detachment System for Implantable Devices," was duly and legally issued on August 16, 2016, and names Matthew Fitz and Joseph Gulachenski as the inventors. A true and correct copy of the '819 Patent is attached as Exhibit C.

26.    U.S. Patent No. 9,717,500 ("the '500 Patent"), entitled "Implant Delivery System," was duly and legally issued on August 1, 2017, and names Tai D. Tieu, Hideo Morita, and Helen Nguyen as the inventors. A true and correct copy of the '500 Patent is attached as Exhibit D.

27.    U.S. Patent No. 10,076,338 ("the '338 Patent"), entitled "Detachable Coil Incorporating Stretch Resistance," was duly and legally issued on September 18, 2018, and names Matthew J. Fitz, Cathy Lei, Joseph Gulachenski, Maricruz Castaneda, and Gary Currie as the inventors. A true and correct copy of the '338 Patent is attached as Exhibit E.

28.    MicroVention is, and continuously from the date of issuance to the date of the filing of this Complaint has been, the owner of the entire right, title, and interest in each of the MicroVention Patents (the '506 Patent, the '819 Patent, '500 Patent, and the '338 Patent).

## BALT'S INFRINGING ACTS

29.    On information and belief, Defendant Balt has and continues to infringe the MicroVention Patents by making, using, selling, and offering for sale the Balt Optima Coil System in the United States, which embodies or uses the inventions claimed in the MicroVention Patents.

4825-3910-3132.v1

30.   The Balt Optima Coil System, shown below, is a coil system which, according to Balt, "consist[s] of a wide range of implant configurations in 3 softness profiles and a unique pusher design" that is designed for use in the treatment of hemorrhagic stroke.



**Figure A**

31.   As shown above, the Optima Coil System includes two main parts: the implant (also referred to as an endovascular embolization coil), which is detached within a patient at an implant site, and the pusher, which is attached to the implant and allows for delivery of the implant to the implant site. The XCEL Detachment Controller, which is used to trigger detachment of the implant from the pusher, is sold separately. However, the Optima Coil System Instructions For Use, attached as Exhibit A, explains that "it is designed for use with the XCEL Detachment Controller" and that

10

"[t]he Optima Coil cannot be detached with any power source other than a [sic] XCEL Detachment Controller."

32.    In order to use the Optima Coil System, a surgeon first guides a catheter through the patient's artery until the tip of the catheter is located at the aneurysm site. The surgeon then removes the Optima coil from its packaging and inserts it into the catheter, with the detachable implant inserted into the catheter first. The surgeon then pushes the coil implant through the catheter to the aneurysm site using the pusher portion of the coil. The coil implant exits the end of the catheter at the implant site.

33.    Once the coil implant is positioned within the aneurysm, the surgeon must then detach the implant from the pusher in order to retract the pusher. In order to do this, the surgeon attaches the XCEL Detachment Controller to the end of the coil's pusher that remains outside of the patient's body. The surgeon then activates the XCEL Detachment Controller and the tether that connects the implant and pusher is heated such that detachment occurs in less than 1 second.

34.    The Optima Coil implant is a small metal coil (or "microcoil") arranged in a helical, or spiral structure that resembles a miniature Slinky toy. The hollow area inside the microcoil implant is called the lumen. Optima Coil implants come in a range of sizes, lengths, and degrees of flexibility to accommodate different sizes of aneurysms, but each implant has this same helical structure. Implants are less than 1mm thick and may range from 1cm to more than 60cm in length.

35.    The Optima Coil pusher is a long, thin, flexible device used by the surgeon to push the implant through the catheter to the implant site and position the implant correctly in the aneurysm. The pusher is itself a coil and, like the implant, has an inner lumen. While the pusher and the implant are approximately the same thickness, the pusher is much longer at 185cm.

36.    The Optima Coil implant and pusher are pre-connected and packaged together in a single package, ready for use. Figures 1 through 27 in the attached Appendix of Photographs ("the Appendix") are true and correct copies of photographs

11

taken of the Balt Optima Coil System product and packaging. Figure 7 of the Appendix shows the Optima Coil pusher and implant after having been removed from the packaging.

37.    The Optima Coil implant is secured to the distal (farthest from the surgeon) end of the pusher by a thin, monofilament thread, or tether. Optima uses Dow's stretch-resistant Polyolefin Engage as its tether. According to Balt's FDA 510(k) application for Optima, the "Coil (implant)" includes as its tether member, a "Stretch resistance/attachment thread" comprised of ".0022" Polyolefin Engage thread". Polyolefin Engage is made of a polymer that is degraded by heat.

38.    The tether is attached to the Optima Coil implant at two places and passes through the implant's lumen. The tether is attached to the distal end of the implant (the tip) by a knot. The tether then runs the length of the implant through its lumen and is attached to the proximal end of the implant (nearest the pusher) by a second knot. Figure 17 of the Appendix shows the points where the tether attaches to the pusher at its distal and proximal ends. Because Polyolefin Engage is stretch-resistant, the tether prevents the implant from being stretched longer than the length of the tether between the two knots and helps the microcoil implant to maintain its shape.

39.    The distal end of the Optima Coil pusher contains a small, resistive heater coil. From the second knot at the proximal end of the implant, the tether continues through the lumen of the heater coil and into the lumen of the pusher body. There, inside the distal end of the pusher, a third knot ties the tether to the pusher, thus connecting the implant to the pusher. Figure 10 of the Appendix shows the tether that connects the implant to the pusher passing through the lumen of the heater coil at the distal end of the pusher.

40.    The segment of the tether that connects the Optima Coil implant and pusher (between the second and third knots) is pre-tensioned. Investigation has determined that approximately 8.66 grams-force (gF) of tension is present in this segment of the tether when the implant and pusher are connected. This amount of

tension is enough to increase the rate at which the tether is severed when the heater is activated, but it is below the elastic limit of Polyolefin Engage.

41.     The segment of the tether that is wholly inside the implant (between the first and second knots) is not pre-tensioned. This segment of the tether is not involved in connecting the implant to the pusher or the detachment process and instead serves to help the microcoil implant maintain its shape.

42.     The small resistive heater at the distal end of the Optima Coil pusher is formed by two metallic coil sections of different diameters through which the tether passes. The distal section is the smaller diameter section and is only slightly larger than the diameter of the tether. Figures 12 and 14 of the Appendix shows the tether passing through both the larger and smaller diameter sections of the heater coil.

43.     Two wires are attached to the heater coil and supply direct current to the heater: a green wire is attached to the distal end of the heater, and a yellow wire is attached to the proximal end of the heater. Both wires run through the entire length of the pusher lumen, from the heater at its distal end all the way to the proximal end nearest the surgeon.

44.     The proximal end of the Optima Coil pusher is designed for electrical connection with the XCEL Detachment Controller. The yellow wire from the heater runs the entire length of the pusher and exits the pusher lumen at its proximal end, forming a conductive core with a connection point for the XCEL controller at the very tip of the pusher. Figure 18 of the Appendix shows the electrical connector at the proximal end of the pusher. Figure 20 of the Appendix shows the connection point formed where the yellow wire exits the pusher and is soldered to the pusher.

45.     The green wire from the heater also runs the length of the pusher but exits the pusher lumen through a small hole roughly 3cm from the proximal end of the pusher. There, the green wire is soldered to a conductive layer formed on the last 3cm of the exterior of the pusher. This conductive layer forms a second connection area for the XCEL controller. Figure 19 of the Appendix shows a close-up of the connection

13

formed by the green wire and the gold conductive layer. The conductive tip where the yellow wire exits the pusher and the conductive layer attached to the green wire are electrically isolated by an insulating layer, together forming a "plug style" connector similar to the familiar "tip and sleeve" audio connectors used in guitar cables and head phone plugs.

46.     The XCEL Detachment Controller provides the power source and control buttons for the heater. The XCEL Detachment Controller is designed with a funnel shape at one end surrounding a small hole. After the implant has been correctly positioned, the surgeon will insert the proximal end of the pusher into the small hole in the XCEL Detachment Controller, aided by the funnel. The conductive tip and layer at the proximal end of the pusher make electrical contact with the internal circuitry of the XCEL Detachment Controller. Details of the XCEL Detachment Controller are shown in Figures 21 through 24 of the Appendix.

47.     When the surgeon presses the button on the XCEL Detachment Controller, direct current is conducted through the pusher via the green and yellow wires to the resistive heater coils. The heater quickly heats the tether passing through its coils, degrading the polymer and severing the tether, thus detaching the implant from the pusher. A portion of the tether remains inside the patient's body with the implant, and the portion of the tether still attached to the pusher is retracted with the pusher. Figures 26 and 27 of the Appendix show the proximal end of the implant and the severed tether following detachment. Because the tether is pre-tensioned, detachment occurs in less than 1 second.

## FIRST CAUSE OF ACTION

### (Infringement of the '506 Patent)

48.     MicroVention incorporates and realleges all the above paragraphs as though fully set forth herein.

49.     Balt has and continues to directly infringe, either literally or under the doctrine of equivalents, one or more claims of the '506 Patent, including independent

14

claim 1, by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, including the XCEL Detachment Controller (collectively, the "Optima Coil System" or "Accused Product") in violation of 35 U.S.C. § 271(a).

50.     Claim 1 recites "[a]n implant delivery system comprising: (a) a delivery pusher; (b) an implant connected to said delivery pusher; (c) a tether connecting said implant to said delivery pusher, said tether having a distal end connected to said implant; (d) [i][1] an electrical heating element associated with said tether; [ii] wherein when activated, said heater causes said tether to break at a point proximal of said distal end such that a distal portion of said tether remains with said implant; and [iii] wherein said tether is in a pre-tensioned state below the elastic limit of the tether material and [iv] wherein said implant device is released from said delivery pusher less than 1 second after activation of said electrical heating element, substantially due to said pre-tensioned state."

51.     With respect to the preamble of claim 1 of the '506 Patent, Balt's Optima Coil System, including the XCEL Detachment Controller, is an "implant delivery system," as shown in Figure A of Paragraph 30 above. Balt advertises that Optima is "the newest state of the art coiling system consisting of a wide range of implant configurations" for use with Balt's Optima pusher and detachment in an instant. *See* https://balt-usa.com/products/optima-coil-system/. As such, to the extent the preamble of claim 1 of the '506 Patent is considered limiting, the Accused Product meets the preamble.

52.     With respect to the first element of claim 1 of the '506 Patent (referred to as element *a* above), the Accused Product includes an "optimal pusher" that meets the "delivery pusher" element, as shown in Figure A of Paragraph 30 above and Figure 7 of the Appendix. As such, the Accused Product meets first element.

---

[1] Additional claim element numbering added for ease of reference.

4825-3910-3132.v1

53.    With respect to the second element of claim 1 of the '506 Patent (referred to as element *b* above), the Optima Coil System is sold ready for use with an implant, also referred to as an endovascular embolization coil, that meets the "implant" element, as shown in Figure 8 of the Appendix. For the Optima Coil System, the implant is connected to the pusher (delivery pusher) via an Engage brand polyolefin elastomeric tether, as shown in Figure 10 of the Appendix. As such, the Accused Product meets the second element.

54.    With respect to the third element of claim 1 of the '506 Patent (referred to as element *c* above), the Optima Coil System includes a "tether" in the form of an Engage brand polyolefin elastomeric tether that secures the implant to the end of the pusher (delivery pusher), as shown in Figure 10 of the Appendix. Furthermore, the distal end of the tether is connected to the distal end of the implant via a knot and adhesive, as shown in Figure 9 of the Appendix. Similarly, the proximal end of the tether is connected to the body of the pusher via a knot and adhesive, as shown in Figures 16 and 17 of the Appendix. As such, the Accused Product meets the third element.

55.    With respect to the first portion of the fourth element of claim 1 of the '506 Patent (referred to as element *d(i)* above), the Optima Coil System includes a resistive heater coil that meets the "electrical heating element" element, as shown in Figure 12 of the Appendix. The Engage brand polyolefin elastomeric tether (tether) that secures the implant to the end of the pusher (delivery pusher) passes through the lumen of the resistive heater coil (electrical heating element) such that the heater coil is associated with the tether, as shown in Figure 14 of the Appendix. As such, the Accused Product meets element *d(i)*.

56.    With respect to the second portion of the fourth element of claim 1 of the '506 Patent (referred to as element *d(ii)* above), when a surgeon presses the activation button on the XCEL Detachment Controller, the resistive heater coil (electrical heating element) is activated by direct current from the XCEL Detachment Controller and

16

begins to heat the tether. Detailed views of the XCEL Detachment Controller are shown in Figures 21 through 24 of the Appendix. The heater, which is at a point proximal to the distal end of the tether, degrades the tether running through its coils and causes the tether to break so that the implant is detached from the pusher. The portion of the tether between the point of breakage and the distal end of the tether, which is connected to the implant, remains with the implant after detachment and thus meets the "distal portion" element, as shown in Figures 26 and 27 of the Appendix. As such, the Accused Product meets element *d(ii)*.

57.    With respect to the third portion of the fourth element of claim 1 of the '506 Patent (referred to as element *d(iii)* above), the segment of the tether that passes through the resistive heater coil (electrical heating element) is tensioned with approximately 8.66 grams-force (gF) of tension during attachment of the implant to the pusher and thus meets the "pre-tensioned" requirement. The pre-tensioning of the tether was confirmed by testing. This amount of pre-tensioning is below the elastic limit of the Engage brand polyolefin elastomer used for the tether. As such, the Accused Product meets element *d(iii)*.

58.    With respect to the fourth portion of the fourth element of claim 1 of the '506 Patent (referred to as element *d(iv)* above), Balt advertises on its website and marketing materials that the Optima Coil System, with its pre-tensioned tether, has a "< 1 second detachment time." *See* https://balt-usa.com/products/optima-coil-system/. Thus, once the resistive heater coil (electrical heating element) is activated, the implant is released from the pusher (delivery pusher) in less than 1 second, which is substantially due to the pre-tensioned state of the tether. As noted above, Balt's use of an implant delivery system with a pre-tensioned tether and a heater coil has resulted in a reduction of the release time by an order of magnitude when compared to its prior product which did not use such technology. As such, the Accused Product meets element *d(iv)*.

4825-3910-3132.v1

59.    In view of the foregoing, Balt's Optima Coil System meets each and every limitation of claim 1 of the '506 Patent, and Balt has and continues to directly infringe claim 1 of the '506 Patent.

60.    Balt also has and continues to indirectly infringe, either literally or under the doctrine of equivalents, one or more claims of the '506 Patent, including independent claim 1, by knowingly and intentionally inducing others to directly infringe, by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, in violation of 35 U.S.C. § 271(b). Such direct infringement by others includes, without limitation, those in the medical community that use the Optima Coil System as described above in Paragraphs 29-47 by following instructions provided by Balt including, without limitation, the Optima Coil System Instructions For Use (Ex. A). Balt intended to cause such infringing acts by others or, in the alternative, had the belief that there was a high probability that others would infringe the '506 Patent, while remaining willfully blind to the infringement.

61.    Balt also has and continues to indirectly infringe, either literally or under the doctrine of equivalents, one or more claims of the '506 Patent, including independent claim 1, by contributing to the direct infringement by others by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, in violation of 35 U.S.C. § 271(c). Such direct infringement by others includes, without limitation, those in the medical community that use Balt's Optima Coil System as described above in Paragraphs 29-47 by following instructions provided by Balt including, without limitation, the Optima Coil System Instructions For Use (Ex. A). Balt had knowledge that the Optima Coil System contains components that constitute a material part of the inventions claimed in the '506 Patent. Such material components include, for example, the implant, pusher attached to the implant, and XCEL Detachment Controller that permits the use of the system to complete and practice the claimed inventions. Balt knows that these

components are especially made or especially adapted for use in an infringement of the '506 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use. Alternatively, Balt believed there was a high probability that others would infringe the '506 Patent but remained willfully blind to the infringing nature of others' actions.

62.   As a direct and proximate result of Balt's acts of infringement, MicroVention has been damaged in an amount not yet determined, including but not limited to lost profits and, in no event, less than a reasonable royalty and/or damages as defined by 35 U.S.C. § 284.

63.   MicroVention has been irreparably harmed by Balt's infringing activities, and MicroVention will continue to be irreparably harmed by such activities in the future unless those infringing activities are enjoined by this Court because, *inter alia*, MicroVention and Balt directly compete for sales of endovascular embolization coils and delivery systems.

64.   On information and belief, Balt's infringement of the '506 Patent has been and continues to be willful and deliberate and MicroVention is entitled to treble damages and attorneys' fees pursuant to 35 U.S.C. § 284.

## SECOND CAUSE OF ACTION

### (Infringement of the '819 Patent)

65.   MicroVention incorporates and realleges all of the above paragraphs as though fully set forth herein.

66.   Balt has and continues to directly infringe, either literally or under the doctrine of equivalents, one or more claims of the '819 Patent, including independent claim 1, by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, including the XCEL Detachment Controller (collectively, the "Optima Coil System" or "Accused Product") in violation of 35 U.S.C. § 271(a).

4825-3910-3132.v1

67.   Claim 1 recites "[a]n implant device delivery system comprising: [A][2] a delivery pusher having a proximal end and a distal end; [B] an electrically activated implant release member; [C] a pre-tensioned tether associated with the implant release member such that said tether is broken by the implant release member when energized; [D] a conductive core member having an externally exposed portion at said proximal end for connection to a power source; [E] an insulating layer disposed on at least a portion of said conductive core member near said proximal end; and, [F] a conductive layer disposed on at least a portion of said insulating layer, and having an externally exposed surface for connection to the power source; [G] wherein said conductive layer and said conductive core conduct an electrical current from said proximal end of said delivery pusher to said electrically activated implant release member; [H] wherein tension in the tether increases the rate at which the tether is broken once a circuit is closed between said externally exposed portion of said conductive core member and said externally exposed surface of said conductive layer."

68.   With respect to the preamble of claim 1 of the '819 Patent, Balt's Optima Coil System, including the XCEL Detachment Controller, is an "implant device delivery system," as shown in Figure A of Paragraph 30 above. Balt advertises that Optima is "the newest state of the art coiling system consisting of a wide range of implant configurations" for use with Balt's Optima pusher and detachment in an instant. *See* https://balt-usa.com/products/optima-coil-system/. As such, to the extent the preamble of claim 1 of the '819 Patent is considered limiting, the Accused Product meets the preamble.

69.   With respect to the first element of claim 1 of the '819 Patent (referred to as element *A* above), the Optima Coil System includes an "optimal pusher" that meets the "delivery pusher" element, as shown in Figure A of Paragraph 30 above and Figure 7 of the Appendix. The pusher of the Optima Coil System is long, flexible, and has a

---

[2] Lettering added for ease of reference.

20

proximal end near the surgeon for connection to an XCEL Detachment Controller and a distal end where the implant is attached. As such, the Accused Product meets the first element.

70.     With respect to the second element of claim 1 of the '819 Patent (referred to as element *B* above), the Optima Coil System includes a resistive heater coil that meets the "electrically activated implant release member" element, as shown in Figure 12 of the Appendix. The resistive heater coil located at the distal end of the pusher is powered by direct current from the XCEL Detachment Controller and thus is "electrically activated." Details of the XCEL Detachment Controller are shown in Figures 21 through 24 of the Appendix. Furthermore, the purpose of the heater coil (electrically activated implant release member) is to release the implant from the pusher upon activation by heating the tether that passes through the lumen of the heather coil such that the tether is severed and the implant is released. As such, the Accused Product meets the second element.

71.     With respect to the third element of claim 1 of the '819 Patent (referred to as element *C* above), the Optima Coil System includes an Engage brand polyolefin elastomeric tether that connects the implant to the pusher, as shown in Figure 10 of the Appendix. The polyolefin elastomeric tether of the Optima Coil System is pre-tensioned with at least 8.66 grams-force (gF) of tension and thus meets the "pre-tensioned tether" element. The pre-tensioning of the tether was confirmed by testing. Furthermore, the tether, which passes through the lumen of the heater coil (electrically activated implant release member), is broken when the heater is energized, as shown in Figures 14 and 26 of the Appendix. As such, the Accused Product meets the third element.

72.     With respect to the fourth element of claim 1 of the '819 Patent (referred to as element *D* above), the pusher of the Optima Coil System has a proximal end that is inserted into an XCEL Detachment Controller (power source) and includes a conductive core with an externally exposed portion for connection to the power source

of the XCEL Detachment Controller. As shown in Figures 12, 16, and 20 of the Appendix, the yellow wire of the Optima Coil System goes from the heater coil (implant release member) through the lumen of the pusher (delivery pusher) and exits the pusher at its proximal end, where the wire attaches to the hypotube section of the pusher and forms an externally exposed conductive tip that connects to the XCEL Detachment Controller (power source). Details of the XCEL Detachment Controller are shown in Figures 21 through 24 of the Appendix. As such, the Accused Product meets the fourth element.

73.     With respect to the fifth element of claim 1 of the '819 Patent (referred to as element *E* above), both the yellow wire and proximal end of the hypotube section of the pusher, each of which may be considered a conducting core, are electrically isolated from the gold, conducting layer on the exterior of the pusher by an insulating layer, as shown in Figures 18 through 20 of the Appendix. As such, the Accused Product meets the fifth element.

74.     With respect to the sixth element of claim 1 of the '819 Patent (referred to as element *F* above), as shown in Figures 12, 16, and 19 of the Appendix, the exterior of the proximal end of the pusher has a conductive layer, disposed on at least a portion of the insulating layer, that is connected to a green wire that runs through the lumen of the pusher from the heater to an externally exposed surface on the proximal end of the pusher. This proximal segment of the pusher forms an electrical connection with the XCEL Detachment Controller (power source) when it is inserted. Details of the XCEL Detachment Controller are shown in Figures 21 through 24 of the Appendix. As such, the Accused Product meets the sixth element.

75.     With respect to the seventh element of claim 1 of the '819 Patent (referred to as element *G* above), the conductive tip of the proximal end of the pusher (conductive core), which is connected to the yellow wire, and the conductive layer (conductive layer), which is connected to the green wire, together form a complete electrical circuit with the XCEL Detachment Controller (power source), that is capable

22

of conducting direct electrical current from the XCEL Detachment Controller to the heater coil (electrically activated implant release member) at the distal end of the pusher. *See* Exhibit A (step 43 of the Optima Coil System Instructions For Use describing the audible beep and green light that result when the pusher is inserted into the XCEL Detachment Controller). As such, the Accused Product meets the seventh element.

76.     With respect to the eighth element of claim 1 of the '819 Patent (referred to as element *H* above), when the surgeon presses the button on the XCEL Detachment Controller, the circuit between the conductive tip of the proximal end of the pusher (externally exposed portion of conductive core), which is connected to the yellow wire, and the conductive layer (externally exposed surface of conductive layer), which is connected to the green wire, is closed and the heater is activated by direct current. As discussed above, Balt advertises on its website and marketing materials that the Optima Coil System, with its pre-tensioned tether, has a "< 1 second detachment time." *See* https://balt-usa.com/products/optima-coil-system/. Thus, once the resistive heater coil (electrically activated implant release member) is activated, the implant is released from the pusher (delivery pusher) in less than 1 second, a release rate that is increased by the pre-tensioning of the tether. As also noted above, Balt's use of an implant delivery system with a pre-tensioned tether and a heater coil has resulted in a reduction of the release time by an order of magnitude when compared to its prior product which did not use such technology. As such, the Accused Product meets the eighth element.

77.     In view of the foregoing, Balt's Optima Coil System meets each and every limitation of claim 1 of the '819 Patent, and Balt has and continues to directly infringe claim 1 of the '819 Patent.

78.     Balt also has and continues to indirectly infringe, either literally or under the doctrine of equivalents, one or more claims of the '819 Patent, including independent claim 1, by knowingly and intentionally inducing others to directly infringe, by making, using, offering to sell, selling, and/or importing into the United

4825-3910-3132.v1

States infringing products, including at least the Optima Coil System, in violation of 35 U.S.C. § 271(b). Such direct infringement by others includes, without limitation, those in the medical community that use the Optima Coil System as described above in Paragraphs 29-47 by following instructions provided by Balt including, without limitation, the Optima Coil System Instructions For Use (Ex. A). Balt intended to cause such infringing acts by others or, in the alternative, had the belief that there was a high probability that others would infringe the '819 Patent, while remaining willfully blind to the infringement.

79.   Balt also has and continues to indirectly infringe, either literally or under the doctrine of equivalents, one or more claims of the '819 Patent, including independent claim 1, by contributing to the direct infringement by others by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, in violation of 35 U.S.C. § 271(c). Such direct infringement by others includes, without limitation, those in the medical community that use Balt's Optima Coil System as described above in Paragraphs 29-47 by following instructions provided by Balt including, without limitation, the Optima Coil System Instructions For Use (Ex. A). Balt had knowledge that the Optima Coil System contains components that constitute a material part of the inventions claimed in the '819 Patent. Such material components include, for example, the implant, pusher attached to the implant, and XCEL Detachment Controller that permits the use of the system to complete and practice the claimed inventions. Balt knows that these components are especially made or especially adapted for use in an infringement of the '819 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use. Alternatively, Balt believed there was a high probability that others would infringe the '819 Patent but remained willfully blind to the infringing nature of others' actions.

80.   As a direct and proximate result of Balt's acts of infringement, MicroVention has been damaged in an amount not yet determined, including but not

4825-3910-3132.v1

limited to lost profits and, in no event, less than a reasonable royalty and/or damages as defined by 35 U.S.C. § 284.

81.     MicroVention has been irreparably harmed by Balt's infringing activities, and MicroVention will continue to be irreparably harmed by such activities in the future unless those infringing activities are enjoined by this Court because, *inter alia*, MicroVention and Balt directly compete for sales of endovascular embolization coils and delivery systems.

82.     On information and belief, Balt's infringement of the '819 Patent has been and continues to be willful and deliberate and MicroVention is entitled to treble damages and attorneys' fees pursuant to 35 U.S.C. § 284.

### THIRD CAUSE OF ACTION

### (Infringement of the '500 Patent)

83.     MicroVention incorporates and realleges all of the above paragraphs as though fully set forth herein.

84.     Balt has and continues to directly infringe, either literally or under the doctrine of equivalents, one or more claims of the '500 Patent, including independent claim 1, by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, including the XCEL Detachment Controller (collectively, the "Optima Coil System" or "Accused Product") in violation of 35 U.S.C. § 271(a).

85.     Claim 1 recites "[a] delivery system for an implant comprising: [A][3] an elongated member having a distal end and a proximal end; [B] said distal end of said elongated member operable to hold said implant; [C] a tether member connectable to said elongated member and to said implant; and, [D] a heating member comprising a resistance-type heater coil that is disposed on said elongated member; [E] said heating member having a hollow passage in which at least a portion of said tether member

---

[3] Lettering added for ease of reference.

resides; [F] a first electrical wire connected at a distal end of said heater coil and a second electrical wire connected at a proximal end of said heater coil, wherein said first electrical wire and said second electrical wire supply direct current between said distal end of said heater coil and said proximal end of said heater coil; [G] said hollow passage comprising a first region having a first plurality of loops with a first internal diameter and a second region having a second plurality of loops with a second internal diameter that is different from said first diameter; [H] wherein said tether member passes through said first plurality of loops and said second plurality of loops; and [I] wherein said second diameter is substantially the same as an outer diameter of said tether member."

86.   With respect to the preamble of claim 1 of the '500 Patent, Balt's Optima Coil System, including the XCEL Detachment Controller, is an "delivery system for an implant," as shown in Figure A of Paragraph 30 above. Balt advertises that Optima is "the newest state of the art coiling system consisting of a wide range of implant configurations" for use with Balt's Optima pusher and detachment in an instant. *See* https://balt-usa.com/products/optima-coil-system/. As such, to the extent the preamble of claim 1 of the '500 Patent is considered limiting, the Accused Product meets the preamble.

87.   With respect to the first element of claim 1 of the '500 Patent (referred to as element *A* above), the Optima Coil System includes a long and flexible pusher that meets the "elongated member" element. The pusher (elongated member) has a proximal end near the surgeon which is connected to the XCEL Detachment Controller and a distal end to which the implant is attached, as shown in Figure A of Paragraph 30 above and Figures 7, 18, and 22 of the Appendix. As such, the Accused Product meets the first element.

88.   With respect to the second element of claim 1 of the '500 Patent (referred to as element *B* above), the distal end of the pusher (elongated member) is connected to an implant via a tether and thus meets the "operable to hold said implant" element,

as shown in Figures 8 and 10 of the Appendix. As such, the Accused Product meets the second element.

89.    With respect to the third element of claim 1 of the '500 Patent (referred to as element *C* above), the Optima Coil System includes an Engage brand polyolefin elastomeric tether that meets the "tether member" element. The tether of the Optima Coil System connects to both the pusher (elongated member) and the implant, as shown in Figure 10 of the Appendix. Specifically, the distal end of the tether is connected to the distal end of the implant via a knot and adhesive and the proximal end of the tether is connected to the body of the pusher via a knot and adhesive, as shown in Figures 9, 16, and 17 of the Appendix. As such, the Accused Product meets the third element.

90.    With respect to the fourth element of claim 1 of the '500 Patent (referred to as element *D* above), the pusher (elongated member) includes a resistive heater coil (resistance-type heater coil) at the distal end of the pusher, as shown in Figures 10 and 12 of the Appendix. As such, the Accused Product meets the fourth element.

91.    With respect to the fifth element of claim 1 of the '500 Patent (referred to as element *E* above), the tether (tether member) connecting the implant to the pusher passes through (and resides in) the lumen (hollow passage) of the resistive heater coil, as shown in Figure 14 of the Appendix. As such, the Accused Product meets the fifth element.

92.    With respect to the sixth element of claim 1 of the '500 Patent (referred to as element *F* above), the heater coil of the Optima Coil System has a first electrical wire, a green wire, connected to the distal end of the heater coil and a second electrical wire, a yellow wire, connected to the proximal end of the heater coil, as shown in Figure 12 of the Appendix. The green and yellow wires run through the length of the pusher's (elongated member) lumen for connection to an XCEL Detachment Controller at the proximal end of the pusher, as shown in Figures 16, 19, and 20 of the Appendix. When activated, the XCEL Detachment Controller supplies direct current to the heater coil through the green and yellow wires, such that direct current flows

4825-3910-3132.v1

between the distal and proximal ends of the heater coil. Details of the XCEL Detachment Controller are shown in Figures 21 through 24 of the Appendix. As such, the Accused Product meets the sixth element.

93. With respect to the seventh element of claim 1 of the '500 Patent (referred to as element *G* above), as shown in Figure 12 of the Appendix, the lumen (hollow passageway) of the heater coil has a first region consisting of a plurality of coils (loops) with a first internal diameter and a second region consisting of a plurality of coils (loops) with a second internal diameter that is different from the internal diameter of the first region. In particular, as shown in Figure 13 of the Appendix, the proximal region of the heater coil has a lumen with a larger internal diameter, while the distal region of the heater coil has a lumen with a smaller internal diameter. As such, the Accused Product meets the seventh element.

94. With respect to the eighth element of claim 1 of the '500 Patent (referred to as element *H* above), the tether (tether member) of the Optima Coil System passes through the lumen of the entire length of the heater coil, including both the first and second regions of the heater coil, as shown in Figure 14 of the Appendix. As such, the Accused Product meets the eighth element.

95. With respect to the ninth element of claim 1 of the '500 Patent (referred to as element *I* above), as shown in Figure 13 of the Appendix, the internal diameter (second diameter) of the lumen of the distal region (second region) of the heater coil is substantially the same as the outer diameter of the tether (tether member). More particularly, the internal diameter (second diameter) of the lumen of the distal region (second region) of the heater coil is approximately 0.0028 inches. According to Balt's FDA 510(k) application for Optima, the "Coil (implant)" includes as its tether member, a "Stretch resistance/attachment thread" comprised of ".0022" Polyolefin Engage thread". The outer diameter of the tether (tether member) is thus 0.0022 inches. As such, the internal diameter (second diameter) of the lumen of the distal region (second region) of the heater coil is approximately 0.0028 inches which is substantially the

28

same as the outer diameter of the tether (tether member) which is 0.0022 inches. The Accused Product meets the ninth element.

96.     In view of the foregoing, Balt's Optima Coil System meets each and every limitation of claim 1 of the '500 Patent, and Balt has and continues to directly infringe claim 1 of the '500 Patent.

97.     Balt also has and continues to indirectly infringe, either literally or under the doctrine of equivalents, one or more claims of the '500 Patent, including independent claim 1, by knowingly and intentionally inducing others to directly infringe, by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, in violation of 35 U.S.C. § 271(b). Such direct infringement by others includes, without limitation, those in the medical community that use the Optima Coil System as described above in Paragraphs 29-47 by following instructions provided by Balt including, without limitation, the Optima Coil System Instructions For Use (Ex. A). Balt intended to cause such infringing acts by others or, in the alternative, had the belief that there was a high probability that others would infringe the '500 Patent, while remaining willfully blind to the infringement.

98.     Balt also has and continues to indirectly infringe, either literally or under the doctrine of equivalents, one or more claims of the '500 Patent, including independent claim 1, by contributing to the direct infringement by others by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, in violation of 35 U.S.C. § 271(c). Such direct infringement by others includes, without limitation, those in the medical community that use Balt's Optima Coil System as described above in Paragraphs 29-47 by following instructions provided by Balt including, without limitation, the Optima Coil System Instructions For Use (Ex. A). Balt had knowledge that the Optima Coil System contains components that constitute a material part of the inventions claimed in the '500 Patent. Such material components include, for example, the implant, pusher

attached to the implant, and XCEL Detachment Controller that permits the use of the system to complete and practice the claimed inventions. Balt knows that these components are especially made or especially adapted for use in an infringement of the '500 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use. Alternatively, Balt believed there was a high probability that others would infringe the '500 Patent but remained willfully blind to the infringing nature of others' actions.

99.   As a direct and proximate result of Balt's acts of infringement, MicroVention has been damaged in an amount not yet determined, including but not limited to lost profits and, in no event, less than a reasonable royalty and/or damages as defined by 35 U.S.C. § 284.

100.   MicroVention has been irreparably harmed by Balt's infringing activities, and MicroVention will continue to be irreparably harmed by such activities in the future unless those infringing activities are enjoined by this Court because, *inter alia*, MicroVention and Balt directly compete for sales of endovascular embolization coils and delivery systems.

101.   On information and belief, Balt's infringement of the '500 Patent has been and continues to be willful and deliberate and MicroVention is entitled to treble damages and attorneys' fees pursuant to 35 U.S.C. § 284.

## FOURTH CAUSE OF ACTION

### (Infringement of the '338 Patent)

102.   MicroVention incorporates and realleges all of the above paragraphs as though fully set forth herein.

103.   Balt has and continues to directly infringe, either literally or under the doctrine of equivalents, one or more claims of the '338 Patent, including independent claim 1, by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, including the

4825-3910-3132.v1

XCEL Detachment Controller (collectively, the "Optima Coil System" or "Accused Product") in violation of 35 U.S.C. § 271(a).

104.   Claim 1 recites "[a] detachable implant delivery system, comprising: [A][4] a delivery device having a heater coil proximate a distal end of said delivery device; [B] a microcoil comprising a helical wire; and, [C] a stretch-resistant member characterized by a single monofilament and connecting said delivery device and said microcoil; [D] said stretch-resistant member passing through a lumen of said microcoil and being attached at a first location near a distal end of said microcoil, at a second location near a proximal end of said microcoil, and at a third location near a distal end of said delivery device, such that said stretch-resistant member is located within said heater coil; [E] wherein a first portion of said stretch-resistant member is between said second location and said third location is tensioned so as to enhance breakage upon application of heat by said heater coil, and [F] wherein a second portion of said stretch-resistant member is isolated from the tension of said first portion so as to resist stretching and thereby retain an original configuration of said microcoil."

105.   With respect to the preamble of claim 1 of the '338 Patent, Balt's Optima Coil System, including the XCEL Detachment Controller, is a "detachable implant delivery system, as shown in Figure A of Paragraph 30 above. Balt advertises that Optima is "the newest state of the art coiling system consisting of a wide range of implant configurations" for use with Balt's Optima pusher and detachment in an instant. *See* https://balt-usa.com/products/optima-coil-system/. As such, to the extent the preamble of claim 1 of the '338 Patent is considered limiting, the Accused Product meets the preamble.

106.   With respect to the first element of claim 1 of the '338 Patent (referred to as element *A* above), the Optima Coil System includes a pusher that meets the "delivery device" element, as shown in Figure A of Paragraph 30 above and Figure 7 of the

---

[4] Lettering added for ease of reference.

31

Appendix. The pusher (delivery device) includes a resistive heater coil that is proximate the distal end of the pusher, as shown in Figures 8, 10, and 12 of the Appendix. As such, the Accused Product meets the first element.

107.   With respect to the second element of claim 1 of the '338 Patent (referred to as element *B* above), the Optima Coil System includes an implant that is a microcoil made of a helical (or spiral shaped) wire, as shown in Figures 8 and 9 of the Appendix. As such, the Accused Product meets the second element.

108.   With respect to the third element of claim 1 of the '338 Patent (referred to as element *C* above), the microcoil implant is secured to the end of the pusher (delivery device) using a stretch-resistant Engage brand polyolefin elastomeric tether that meets the "stretch-resistant member" element, as shown in Figure 10 of the Appendix. The Engage brand polyolefin elastomeric tether is a single monofilament.  As such, the Accused Product meets the third element.

109.   With respect to the fourth element of claim 1 of the '338 Patent (referred to as element *D* above), the tether (stretch-resistant member) of the Optima Coil System attaches at a first location near the distal end (or tip) of the microcoil implant via a knot and adhesive (as shown in Figures 9 and 17 of the Appendix); passes through the lumen of the microcoil implant (*Id.*); attaches at a second location near the proximal end of the microcoil implant, closer to the pusher (delivery device), via a knot and adhesive (as shown in Figures 11 and 17 of the Appendix); passes through the lumen of the heater coil (as shown in Figure 14 of the Appendix); and then attaches at a third location near the distal end of the pusher (delivery device) via a knot and adhesive (as shown in Figures 16 and 17 of the Appendix). As such, the Accused Product meets the fourth element.

110.   With respect to the fifth element of claim 1 of the '338 Patent (referred to as element *E* above), the segment (first portion) of the tether (stretch-resistant member) between the third attachment point that connects the tether to the pusher (delivery device) and the second attachment point that connects the tether to the proximal end of

4825-3910-3132.v1

the microcoil implant is pre-tensioned with 8.66 grams-force (gF) of tension. The pre-tensioning of the tether was confirmed by testing. Once the heater coil is activated, the tether (stretch-resistant member) breaks and the microcoil implant is released from the pusher (delivery device) in less than 1 second. *See* https://balt-usa.com/products/optima-coil-system/. As noted above, Balt's use of an implant delivery system with a pre-tensioned tether and a heater coil has resulted in a reduction of the release time by an order of magnitude when compared to its prior product which did not use such technology, and thus the tension in the tether enhances the breakage of the tether upon application of heat. As such, the Accused Product meets the fifth element.

111.   With respect to the sixth element of claim 1 of the '338 Patent (referred to as element *F* above), the segment (second portion) of the tether (stretch-resistant member) between the first attachment point that connects the tether to the distal end of the microcoil implant and the second attachment point that connects the tether to the proximal end of the microcoil implant is isolated from the tension in the first portion by the knot and adhesive located at the second attachment point, which divides the first and second portions of the tether, as shown in Figures 9, 11, and 17 of the Appendix. The segment (second portion) of the tether that is not pre-tensioned is stretch-resistant due to the Engage brand polyolefin elastomeric tether attached to the microcoil implant and thus serves to retain the original configuration of the microcoil implant. As such, the Accused Product meets the sixth element.

112.   In view of the foregoing, Balt's Optima Coil System meets each and every limitation of claim 1 of the '338 Patent, and Balt has and continues to directly infringe claim 1 of the '338 Patent.

113.   Balt also has and continues to indirectly infringe, either literally or under the doctrine of equivalents, one or more claims of the '338 Patent, including independent claim 1, by knowingly and intentionally inducing others to directly infringe, by making, using, offering to sell, selling, and/or importing into the United

33

States infringing products, including at least the Optima Coil System, in violation of 35 U.S.C. § 271(b). Such direct infringement by others includes, without limitation, those in the medical community that use the Optima Coil System as described above in Paragraphs 29-47 by following instructions provided by Balt including, without limitation, the Optima Coil System Instructions For Use (Ex. A). Balt intended to cause such infringing acts by others or, in the alternative, had the belief that there was a high probability that others would infringe the '338 Patent, while remaining willfully blind to the infringement.

114.   Balt also has and continues to indirectly infringe, either literally or under the doctrine of equivalents, one or more claims of the '338 Patent, including independent claim 1, by contributing to the direct infringement by others by making, using, offering to sell, selling, and/or importing into the United States infringing products, including at least the Optima Coil System, in violation of 35 U.S.C. § 271(c). Such direct infringement by others includes, without limitation, those in the medical community that use Balt's Optima Coil System as described above in Paragraphs 29-47 by following instructions provided by Balt including, without limitation, the Optima Coil System Instructions For Use (Ex. A). Balt had knowledge that the Optima Coil System contains components that constitute a material part of the inventions claimed in the '338 Patent. Such material components include, for example, the implant, pusher attached to the implant, and XCEL Detachment Controller that permits the use of the system to complete and practice the claimed inventions. Balt knows that these components are especially made or especially adapted for use in an infringement of the '338 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use. Alternatively, Balt believed there was a high probability that others would infringe the '338 Patent but remained willfully blind to the infringing nature of others' actions.

115.   As a direct and proximate result of Balt's acts of infringement, MicroVention has been damaged in an amount not yet determined, including but not

34

limited to lost profits and, in no event, less than a reasonable royalty and/or damages as defined by 35 U.S.C. § 284.

116. MicroVention has been irreparably harmed by Balt's infringing activities, and MicroVention will continue to be irreparably harmed by such activities in the future unless those infringing activities are enjoined by this Court because, *inter alia*, MicroVention and Balt directly compete for sales of endovascular embolization coils and delivery systems.

117. On information and belief, Balt's infringement of the '338 Patent has been and continues to be willful and deliberate and MicroVention is entitled to treble damages and attorneys' fees pursuant to 35 U.S.C. § 284.

## PRAYER FOR RELIEF

**WHEREFORE**, MicroVention requests judgment in its favor and against Balt as follows:

118. Adjudging that Balt has infringed the MicroVention Patents, in violation of 35 U.S.C. §§ 271(a), (b) and (c);

119. Granting an injunction permanently enjoining Balt, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all of those in active concert and participation with any of the foregoing persons or entities from infringing, contributing to the infringement of, or inducing infringement of the MicroVention Patents;

120. Ordering Balt to account and pay damages adequate to compensate MicroVention for Balt's infringement of the MicroVention Patents, including pre-judgment and post-judgment interest and costs, pursuant to 35 U.S.C. § 284;

121. Ordering an accounting for any infringing sales not presented at trial and an award by the court of additional damages for any such infringing sales;

122. Ordering that the damages award be increased up to three times the actual amount assessed, pursuant to 35 U.S.C. § 284;

4825-3910-3132.v1

123.   Declaring this case exceptional and awarding MicroVention its reasonable attorneys' fees, pursuant to 35 U.S.C. § 285; and

124.   Awarding such other and further relief as this Court deems just and proper.

Dated: July 8, 2019

PILLSBURY WINTHROP SHAW PITTMAN LLP

EVAN FINKEL
MICHAEL S. HORIKAWA
CHAZ M. HALES

By _____/s/ Evan Finkel_____
Evan Finkel
Attorneys for Plaintiff MicroVention, Inc.

## **DEMAND FOR JURY TRIAL**

Plaintiff MicroVention, Inc. hereby demands a jury trial, as provided by Rule 38 of the Federal Rules of Civil Procedure, on all claims that are triable to a jury.

Dated: July 8, 2019

PILLSBURY WINTHROP SHAW PITTMAN LLP

EVAN FINKEL
MICHAEL S. HORIKAWA
CHAZ M. HALES

By _____/s/ Evan Finkel_____
Evan Finkel
Attorneys for Plaintiff MicroVention, Inc.

36

4825-3910-3132.v1