# EXHIBIT 1

1  Sheila N. Swaroop (SBN 203,476)
   Sheila.Swaroop@knobbe.com
2  William O. Adams (SBN 259,001)
   William.adams@knobbe.com
3  KNOBBE, MARTENS, OLSON & BEAR, LLP
   2040 Main Street
4  Fourteenth Floor
   Irvine, CA  92614
5  Phone: (949) 760-0404
   Facsimile: (949) 760-9502
6
   Nicholas A. Belair (SBN 295,380)
7  Nicholas.Belair@knobbe.com
   KNOBBE, MARTENS, OLSON & BEAR, LLP
8  333 Bush Street, 21st Floor
   San Francisco, CA 94104
9  Phone: (415) 954-4111
   Facsimile: (415) 954-4111
10
   Alexander D. Zeng (SBN 317,234)
11 Alexander.zeng@knobbe.com
   KNOBBE, MARTENS, OLSON & BEAR, LLP
12 1925 Century Park East, Suite 600
   Los Angeles, CA 90067
13 Phone: (310) 551-3450
   Facsimile: (310) 551-3458
14
   Attorneys for Defendant,
15 Balt USA, LLC

16

17              IN THE UNITED STATES DISTRICT COURT

18            FOR THE CENTRAL DISTRICT OF CALIFORNIA

19                       SOUTHERN DIVISION

20 MICROVENTION, INC.,                 )  Civil Action No.
                                       )  8:19CV01335-JLS (KESx)
21              Plaintiff,             )
                                       )
22       v.                            )  **DEFENDANT BALT USA, LLC'S**
                                       )  **PRELIMINARY INVALIDITY**
23 BALT USA, LLC,                      )  **DISCLOSURES**
                                       )
24              Defendant.             )
                                       )  **CONTAINS INFORMATION**
25                                     )  **DESIGNATED CONFIDENTIAL-**
                                       )  **ATTORNEYS' EYES ONLY**
26                                     )
                                       )
27 ─────────────────────────────       )
                                       )
28 AND RELATED COUNTERCLAIMS           )

Exhibit 1
-5-

# TABLE OF CONTENTS

**Page No.**

I. GENERAL STATEMENTS ........................................................................ 1

    A.    Identification of Asserted Claims ................................................. 2

    B.    Claim Construction ..................................................................... 2

    C.    Ongoing Discovery and Disclosures ........................................... 4

II. PRIOR ART ........................................................................................ 4

    A.    Priority Date of the '506 Patent ................................................... 5

    B.    Priority Date of the '819 Patent ................................................... 5

    C.    Priority Date of the '338 Patent ................................................... 6

    D.    Printed Publications Prior Art ...................................................... 6

        1.    *Cox* ................................................................................ 6

        2.    *Elliot* ............................................................................. 7

        3.    *Engelson* ....................................................................... 7

        4.    *Fenn* .............................................................................. 7

        5.    *Fitz* ............................................................................... 7

        6.    *Gandhi I* ........................................................................ 8

        7.    *Gandhi II* ....................................................................... 8

        8.    *Gandhi III* ...................................................................... 8

        9.    *Geremia* ......................................................................... 8

        10.    *Guglielmi I* ................................................................... 9

        11.    *Handa* ........................................................................... 9

        12.    *Harper* .......................................................................... 9

        13.    *Henningsen* ................................................................... 9

        14.    *Ken* ............................................................................. 10

        15.    *Kester* ......................................................................... 10

        16.    *Kurz* ........................................................................... 10

Exhibit 1
-6-

# TABLE OF CONTENTS
### (*cont'd*)

Page No.

17. *Mirigian* .................................................................... 10

18. *Monetti* .................................................................... 10

19. *Ogawa* .................................................................... 11

20. *Pham* .................................................................... 11

21. *Scheldrup* .................................................................... 11

22. *Simon* .................................................................... 11

23. *Taki* .................................................................... 12

24. *Wheelock* .................................................................... 12

25. *Whitfield* .................................................................... 12

26. *Whittaker* .................................................................... 12

27. *Wilson* .................................................................... 13

E. Prior Art Products .................................................................... 13

1. Micrus Corporation's *Micrus Stretch-Resistant MicroCoil System and Micrus MicroCoil System* ............ 13

2. Target Therapeutics' *TARGET*® *System* ............................ 14

3. MVI's *MicroPlex*® *Coil System, HydroCoil*® *Embolic System, HydroLink*® Delivery System, and *V-Trak*® Delivery System .................................... 14

4. Cordis Neurovascular, Inc.'s *TRUFILL*® *DCS Orbit System* .................................................................... 15

III. RELEVANT LEGAL STANDARDS ...................................... 15

A. Anticipation Under 35 U.S.C. § 102 ................................... 15

B. Obviousness under 35 U.S.C. § 103 ................................... 16

C. Written Description & Enablement under 35 U.S.C. § 112, First Paragraph .................................................................... 18

IV. LEVEL OF ORDINARY SKILL IN THE ART ........................ 19

Exhibit 1
-7-

**TABLE OF CONTENTS**
*(cont'd)*

Page No.

V. STATE OF THE RELEVANT ART AS OF THE EARLIEST ALLEGED PRIORITY OF THE ASSERTED CLAIMS, MAY 27, 2005 ................................................................................ 20

    A.    Microcoil Embolic Devices Were Well-Known ........................................... 20

    B.    Delivery Pushers Were Well-Known ........................................... 22

    C.    Alternative Detachment Mechanisms Were Well-Known ........................ 23

    D.    Stretch-Resistant Microcoils Were Well-Known ..................................... 27

    E.    Reducing Implant Detachment Time Was A Common Goal ...................... 29

VI. INVALIDITY OF THE ASSERTED PATENTS UNDER 35 U.S.C. §§ 102, 103, AND/OR 112 ........................................................ 30

    A.    General Grounds Applicable to Each of the Asserted Patents ................... 30

    B.    Invalidity of the '506 Patent Under 35 U.S.C. §§ 102 & 103 .................... 33

        1.    The Asserted Claims Are Invalid Under 35 U.S.C. § 102 .................................................................... 33

        2.    The Asserted Claims Are Invalid Under 35 U.S.C. § 103 .................................................................... 33

        a.    *Wilson* alone, in view of the knowledge of a person of ordinary skill in the art ..................................... 34

        b.    *Wilson*, in combination with one or more of *Gandhi I*, *Kester*, Cox, *Taki*, Ogawa, and/or the *Micrus Stretch-Resistant MicroCoil System* ..................... 36

    C.    Invalidity of the '819 Patent Under 35 U.S.C. § 103 ................................. 42

        1.    *Wilson* in combination with one or more of *Gandhi I*, *Kester*, *Cox*, *Taki*, *Ogawa*, *Whittaker*, the *Micrus Stretch-Resistant MicroCoil System*, and/or *Scheldrup*, and the knowledge of a person of ordinary skill in the art. ...................................... 42

    D.    Invalidity of the '338 Patent Under 35 U.S.C. §§ 102 & 103 .................... 48

        1.    The Asserted Claims Are Invalid Under 35 U.S.C. § 102 .................................................................... 48

**TABLE OF CONTENTS**
(*cont'd*)

Page No.

2. The Asserted Claims Are Invalid Under 35 U.S.C.
§ 103 .................................................................48

a. *Fitz* alone, in view of the knowledge of a person of
ordinary skill in the art....................................49

b. *Fitz*, in combination with one or more of *Ken*
and/or *Simon* .................................................49

c. *Wilson* in combination with one or more of
*Gandhi I*, *Kester*, *Cox*, *Taki*, *Ogawa*, the *Micrus
Stretch-Resistant MicroCoil System and/or Ken
and/or Simon* ..................................................52

E. Invalidity under 35 U.S.C. § 112................................55

1. Invalidity of the '506 Patent under 35 U.S.C. §
112 ................................................................56

2. Invalidity of the '819 Patent under 35 U.S.C. §
112 ................................................................59

VII. SECONDARY CONSIDERATIONS ......................................59

A. Commercial Success.............................................60

B. Copying.......................................................61

C. Failure of Others.............................................62

D. Industry Praise ..............................................62

E. Any Other Secondary Considerations ...........................63

VIII. CLAIM CHARTS...................................................63

IX. DOCUMENT PRODUCTION .............................................63

Exhibit 1
-9-

In accordance with this Court's October 16, 2019 Scheduling Order (Dkt. No. 21), Defendant Balt USA, LLC ("Balt") hereby provides the following Preliminary Invalidity Contentions ("Initial Invalidity Contentions") to Plaintiff MicroVention, Inc. ("MVI" or "Plaintiff").

# I. GENERAL STATEMENTS

These initial contentions are based on information reasonably available to Balt at this time, are necessarily preliminary, and may require subsequent amendment, alteration and/or supplementation. Accordingly, Balt reserves the right to amend, alter and/or supplement these contentions based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of Plaintiff's contentions. These contentions may be in the alternative and do not constitute any concession by Balt for purposes of claim construction or non-infringement. *See* Fed. R. Civ. P. 8(d).

Furthermore, these contentions are provided without prejudice to Balt's right to introduce at trial any subsequently discovered evidence or expert opinions relating to currently-known facts and to produce and introduce at trial all evidence, whenever discovered, relating to the proof of subsequently discovered facts. Moreover, facts, documents, and things now known may be imperfectly understood and, accordingly, such facts, documents, and things may not be included in the following contentions. Balt reserves the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents and things notwithstanding the written statements herein. Balt further reserves its right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, documents and things that are not currently recalled but might be recalled at some time in the future.

Exhibit 1
-10-

Balt objects to the disclosure of information that is protected by the attorney-client privilege, the attorney work-product immunity, the common interest privilege or any other applicable privilege or immunity. To the extent that Balt inadvertently discloses information that may be protected from discovery under the attorney-client privilege, the attorney work-product immunity, the common interest privilege or any other applicable privilege or immunity, such inadvertent disclosure does not constitute a waiver of any such privilege or immunity.

The information set forth below is provided without waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other action, on the grounds of privilege, relevance, materiality or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement or clarify any of the statements provided below at any time.

## A.    **Identification of Asserted Claims**

Plaintiff asserts that Balt infringes claims 1-8, 10, 13-16, 18-20, 23-29, 31, and 33 of U.S. Patent No. 8,182,506 (the "'506 Patent"), claims 1, 5, 7, 10-13, 15 and 17-18 of U.S. Patent No. 9,414,819 (the '819 Patent), and claims 1-4 and 7-9 of U.S. Patent No. 10,076,338 (the '338 Patent) (collectively, the "Asserted Claims"). *See* Plaintiff's November 15, 2019 Preliminary Disclosure of Asserted Claims and Infringement Contentions (the "Preliminary Infringement Contentions"). These Initial Invalidity Contentions address all of the Asserted Claims, and Balt reserves its right to provide invalidity contentions on all claims of the '506 Patent, the '819 Patent, and/or the '338 Patent (collectively, the "Patents-in-suit" or "Asserted Patents").

## B.    **Claim Construction**

The Court has not yet construed the Asserted Claims. Nor have any of the parties proposed any claim constructions of the Asserted Claims that may be in

Exhibit 1
-11-

dispute. Balt's position on the invalidity of particular claims will depend on how these claims are construed by the Court. Balt therefore reserves the right to identify additional prior art and/or to supplement its disclosures or contentions in light of the Court's construction of the Asserted Claims. The Initial Invalidity Contentions Balt presents herein are based, at least in part, on Balt's present understanding of the Asserted Claims.

To the extent that these Initial Invalidity Contentions reflect constructions of claim terms that may be consistent with or implicit in Plaintiff's Preliminary Infringement Contentions, no inference is intended, nor should any inference be drawn, that Balt agrees with such claim constructions. Balt takes no position on any matter of claim construction in these Initial Invalidity Contentions other than to allege that certain claim terms are invalid as anticipated under 35 U.S.C. § 102, obvious under 35 U.S.C. § 103, and/or are indefinite, not enabling and/or lacking written description support under 35 U.S.C. § 112, as set forth below. Any statement herein describing or tending to describe any claim element is provided solely for the purpose of understanding the relevant prior art or other basis for invalidity. Balt expressly reserves the right to propose any claim construction it considers appropriate and/or contest any claim construction it considers inappropriate.

In part because claim construction has not been resolved, these Initial Invalidity Contentions may be made in the alternative and are not necessarily intended to be consistent with each other, and should be viewed accordingly. Furthermore, Balt's inclusion of prior art that would render a claim anticipated or obvious based on a particular scope or construction of the claim, including that apparently applied by Plaintiff in its Preliminary Infringement Contentions, is not, and should in no way be seen as, an adoption or admission as to the accuracy of such scope or construction. Balt reserves all rights to further supplement and/or modify the positions and information in these Initial Invalidity Contentions,

Exhibit 1
-12-

including without limitation, the prior art and grounds of invalidity set forth herein, after the Court has construed the Asserted Claims.

**C.    Ongoing Discovery and Disclosures**

Discovery in this case is in its early stages and Balt's investigation, including Balt's search for prior art, is ongoing. Balt therefore reserves the right to further supplement and/or alter the positions taken and information disclosed in these Initial Invalidity Contentions including, without limitation, the prior art and grounds of invalidity set forth herein, to take into account information or defenses that may come to light as a result of these continuing efforts.

Moreover, because expert discovery has not started, Balt reserves the right to amend these Initial Invalidity Contentions as a result of new information disclosed through the parties' experts. Therefore, Balt reserves all rights to further supplement and/or amend these Initial Invalidity Contentions if and when further information becomes available.

## II.  PRIOR ART

In addition to all of the prior art references found on the face of the Patents-in-suit and discussed in the prosecution record for each of the Patents-in-suit, which Balt incorporates fully herein, Balt identifies the following items of prior art which anticipate one or more of the claims of the Patents-in-suit under 35 U.S.C. § 102, and separately or in any reasonable combination, render obvious one or more of the claims of the Patents-in-suit under 35 U.S.C. § 103. Balt further incorporates by reference, in full, all references cited in the following prior art references and their prosecution histories, where applicable. The citations provided are representative of the references and are not exhaustive. To the extent that similar claim limitations occur in one or more claims, the disclosures below should be read to apply to all similar claim limitations.

Moreover, many of the references discussed herein are representative of additional prior art references in the relevant field. Persons of ordinary skill in the

art at the time of the filing of the Patents-in-suit knew or read references as a whole, and in the context of other publications, literature and the general knowledge in the field. Balt may rely on all such information, including other portions of the prior art references listed herein and other publications and expert testimony, to provide context and as aids to understanding and interpreting the listed references, or to establish that it would have been obvious for a person of ordinary skill in the art to modify or combine any of the cited references. Balt reserves the right to modify these Initial Invalidity Contentions to add additional prior art references, including prior art commercial products, in light of the information gained through discovery, expert discovery, arguments or positions advanced by Plaintiff, or the Court's claim construction rulings.

## A.   Priority Date of the '506 Patent

The application which issued as the '506 Patent was filed on August 25, 2005, as U.S. Application No. 11/212,830 ("the '830 Application").  The '830 Application claims priority to U.S. Provisional Application No. 60/685,342, filed on May 27, 2005, and U.S. Provisional Application No. 60/604,671, filed on August 25, 2004.  In its infringement contentions, MVI claims priority to May 27, 2005 for claims 1, 3-8, 10, 13-15, 18-20, 23, 25-29, 31 and 33 and August 25, 2005 for claims 2, 16, and 24.  For purposes of these disclosures, Balt relies on MVI's stated priority dates, and reserves the right to modify, amend, or otherwise supplement these disclosures to the extent MVI later relies on an earlier priority date for any of the claims of the '506 Patent.

## B.   Priority Date of the '819 Patent

The application which issued as the '819 Patent was filed on May 3, 2006, as U.S. Application No. 11/416,826 ("the '826 Application").  The '826 Application claims priority to several related applications as follows: a continuation application of U.S. Application No. 11/212,830, filed on August 25, 2005, now U.S. Patent No. 8,182,506, which claims priority to U.S. Provisional

Exhibit 1
-14-

Application No. 60/685,342, filed on May 27, 2005, and U.S. Provisional Application No. 60/604,671, filed on August 25, 2004. In its infringement contentions, MVI claims priority to May 27, 2005 for claims 1, 5, 7, 10-12, 15, 17, and 19 and August 25, 2005 for claims 13 and 18. For purposes of these disclosures, Balt relies on MVI's stated priority dates, and reserves the right to modify, amend, or otherwise supplement these disclosures to the extent MVI later relies on an earlier priority date for any of the claims of the '819 Patent.

**C.    Priority Date of the '338 Patent**

The application which issued as the '338 Patent was filed on March 25, 2016, as U.S. Application No. 15/081,065 ("the '065 Application"). The '065 Application claims priority to several related applications as follows: a continuation application of U.S. Application No. 12/180,834, filed on July 28, 2008, now abandoned, which claims priority to U.S. Provisional Application No. 60/952,520, filed on July 27, 2007. Thus, the earliest possible priority date for any of the claims of the '338 Patent is July 27, 2007.

**D.    Printed Publications Prior Art**

The following list and summary of printed publications prior art is not meant to be comprehensive, and any quotations or citations provided herein are representative of the references and are not exhaustive. Specifically, Balt reserves the right to rely on other portions of the listed references, other references not listed herein, and other combinations of these references which a skilled artisan would have been motivated to make as of the earliest alleged priority dates of the '506 Patent, the '819 Patent, and the '338 Patent.

**1.    _Cox_**

U.S. Patent Application Publication No. 2005/0149108 ("_Cox_") is entitled "Implant delivery and detachment system and method." _Cox_ was published on July 7, 2005, was filed on December 17, 2003, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a) and § 102(e),

Exhibit 1
-15-

and is also prior art to the '338 Patent under pre-AIA § 102(b).  The current assignee is MicroVention, Inc.

### 2.    *Elliot*

U.S. Patent Application Publication No. 2002/0188341 ("*Elliot*") is entitled "Stent with detachable tethers and method of using same."  *Elliot* was published on December 12, 2002, was filed on May 10, 2001, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e).  The current assignee is Boston Scientific Scimed, Inc.

### 3.    *Engelson*

U.S. Patent No. 4,739,768 ("*Engelson*") is entitled "Catheter for guide-wire tracking."  *Engelson* was issued on November 15, 1994, was filed on June 2, 1986, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e).  The current assignee is Stryker European Holdings I, LLC.

### 4.    *Fenn*

U.S. Patent No. 6,807,446 ("*Fenn*") is entitled "Monopole phased array thermotherapy applicator for deep tumor therapy."  *Fenn* was issued on October 19, 2004, was filed on September 3, 2002, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e).  The current assignee is Celsion Corporation.

### 5.    *Fitz*

U.S. Patent Application Publication No. 2006/0052815 ("*Fitz*") is entitled "Thermal Detachment System for Implantable Devices."  *Fitz* was published on March 9, 2006, was filed on August 25, 2005, and is prior art to the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e).  The assignee is MicroVention, Inc.

/ / /

Exhibit 1
-16-

### 6. *Gandhi I*

U.S. Patent No. 6,478,773 ("*Gandhi I*") is entitled "Apparatus for Deployment of Micro-Coil Using a Catheter." *Gandhi I* was issued on November 12, 2002, was filed on February 9, 2000, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is DePuy Synthes Products, Inc.

### 7. *Gandhi II*

U.S. Patent No. 6,500,149 ("*Gandhi II*") is entitled "Apparatus for deployment of micro-coil using a catheter." *Gandhi II* was issued on December 31, 2002, was filed on February 21, 2001, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Micrus Corporation.

### 8. *Gandhi III*

U.S. Patent No. 6,966,892 is entitled "Apparatus for deployment of micro-coil using a catheter." *Gandhi III* was issued on November 22, 2005, was filed on November 7, 2002, published as U.S. Patent Application Publication No. 2003/0069539 ("*Gandhi III*") on April 10, 2003, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Micrus Corporation. For purposes of these contentions suit, Balt relies on U.S. Patent Application Publication No. 2003/0069539.

### 9. *Geremia*

U.S. Patent No. 5,108,407 ("*Geremia*") is entitled "Method and apparatus for placement of an embolic coil." *Geremia* was issued on April 28, 1992, was filed on June 8, 1990, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is the Rush-Presbyterian St. Luke's Medical Center.

/ / /

Exhibit 1
-17-

### 10. *Guglielmi I*

U.S. Patent No. 5,895,385 ("*Guglielmi I*") is entitled "Endovascular electrolytically detachable wire and tip for the formation of thrombus in arteries, veins, aneurysms, vascular malformations and arteriovenous fistulas." *Guglielmi I* was issued on April 20, 1999, was filed on November 6, 1997, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is the Regents of the University of California.

### 11. *Handa*

U.S. Patent No. 4,346,712 ("*Handa*") is entitled "Releasable balloon catheter." *Handa* was issued on August 31, 1982, was filed on February 13, 1980, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Kuraray Co., Ltd.

### 12. *Harper*

U.S. Patent No. 6,338,657 ("*Harper*") is entitled "Hand piece connector." *Harper* was issued on January 15, 2002, was filed on October 20, 2000, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Ethicon Endo-Surgery Inc.

### 13. *Henningsen*

U.S. Patent Application Publication No. 20050118865 ("*Henningsen*") is entitled "Coaxial connector and method." Henningsen was published on June 2, 2005, was filed on December 1, 2003, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Corning Optical Communications RF LLC.

/ / /

/ / /

Exhibit 1
-18-

### 14. <u>*Ken*</u>

U.S. Patent No. 6,193,728 ("*Ken*") is entitled "Stretch resistant vaso-occlusive coils (II)." *Ken* was issued on February 27, 2001, was filed on November 4, 1999, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Stryker Corp Stryker European Holdings I, LLC.

### 15. <u>*Kester*</u>

U.S. Patent No. 4,540,873 ("*Kester*") is entitled "System for breaking a tensioned connecting element." *Kester* was issued on September 10, 1985, was filed on March 2, 1984, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Dutch Space B.V.

### 16. <u>*Kurz*</u>

U.S. Patent No. 6,296,622 ("*Kurz*") is entitled "Endoluminal Device Delivery System Using Axially Recovering Shape Memory Material." *Kurz* was issued on October 2, 2001, was filed on December 21, 1998, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Micrus Corporation.

### 17. <u>*Mirigian*</u>

U.S. Patent No. 5,578,074 ("*Mirigian*") is entitled "Implant Delivery Method and Assembly." *Mirigian* was issued on November 26, 1996, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Target Therapeutics, Inc.

### 18. <u>*Monetti*</u>

U.S. Patent No. 7,048,719 ("*Monetti*") is entitled "Endovascular catheter resheathing apparatus and related methods." *Monetti* was issued on May 23, 2006, was filed on June 7, 2002, and is prior art to the '506 Patent, the '819 Patent,

Exhibit 1
-19-

and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is MicroVention, Inc.

### 19. *Ogawa*

U.S. Patent No. 5,759,161 ("*Ogawa*") is entitled "Medical Wire and Method for Leaving Implanted Devices." *Ogawa* was issued on June 2, 1998, was filed on April 26, 1996, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Kaneka Medix Corporation.

### 20. *Pham*

U.S. Patent No. 5,624,449 ("*Pham*") is entitled "Electrolytically severable joint for endovascular embolic devices." *Pham* was issued on April 29, 1997, was filed on April 28, 1995, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Stryker European Holdings I, LLC.

### 21. *Scheldrup*

U.S. Patent No. 6,397,850 ("*Scheldrup*") is entitled "Dual-mode apparatus and method for detection of embolic device detachment." *Scheldrup* was issued on June 4, 2002, was filed on February 9, 2000, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Stryker Corp Stryker European Holdings I, LLC.

### 22. *Simon*

U.S. Patent Application Publication No. 2007/0239193 ("*Simon*") is entitled "Stretch-resistant vaso-occlusive devices with distal anchor link." *Simon* was published on October 11, 2007, was filed on April 5, 2006, and is prior art to the '338 Patent under least pre-AIA § 102(e). The assignee is Stryker European Holdings I, LLC.

/ / /

Exhibit 1
-20-

### 23. *Taki*

U.S. Patent No. 5,891,058 ("*Taki*") is entitled "Coiled Embolizing Material." *Taki* was issued on April 6, 1999, was filed on August 6, 1997, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Kaneka Medix Corporation.

### 24. *Wheelock*

U.S. Patent Application Publication No. 2002/0091380 ("*Wheelock*") is entitled "Assembly containing an electrolytically severable joint for endovascular embolic devices." *Wheelock* was published on July 11, 2002, was filed on February 28, 2002, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is Stryker European Holdings I, LLC.

### 25. *Whitfield*

U.S. Patent No. 5,470,338 ("*Whitfield*") is entitled "Instrument for closing trocar puncture wounds." *Whittfield* was issued on November 28, 1995, was filed on October 8, 1993, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e). The current assignee is United States Surgical Corp.

### 26. *Whittaker*

U.S. Patent Application Publication No. 2005/0273020 ("*Whittaker*") is entitled "Vascular guidewire system." *Whittaker* was published on December 8, 2005 from an application that was filed on March 24, 2005. That application claims priority to U.S. Provisional Application No. 60/555,858 which was filed on March 24, 2004 and to U.S. Provisional Application No. 60/632,580 which was filed on December 1, 2004. *Whittaker* is thus prior art to the '506, '819, and '338 Patents under at least pre-AIA § 102(a), and is prior art to the '338 Patent under pre-AIA § 102(b). The assignee is Windcrest LLC.

Exhibit 1
-21-

27.    _Wilson_

U.S. Patent Application Publication No. 2004/0034363 ("_Wilson_") is entitled "Stretch Resistant Therapeutic Device."    _Wilson_ was published on February 19, 2004, was filed on July 23, 2002, issued as U.S. Patent No. 7,608,058 on October 27, 2009, and is prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least pre-AIA § 102(a), § 102(b), and § 102(e).  The current assignee is DePuy Syntheses Products, Inc.

E.    **Prior Art Products**

The following list and summary of prior art commercial products is not meant to be comprehensive, and any quotations or citations to literature regarding these products are provided as representative of the product profile and are not exhaustive.  Specifically, Balt reserves the right to rely on other portions of the listed product profile references, other references not listed herein, any testing of these products, and other combinations of these references which a skilled artisan would have been motivated to make as of the alleged priority dates of the '506 Patent, the '819 Patent, and the '338 Patent.  In addition, Balt reserves the right to test these products, and any other products once they are produced in discovery in this case, and update its Initial Invalidity Contentions accordingly.

1.    **Micrus Corporation's** _Micrus Stretch-Resistant MicroCoil System and Micrus MicroCoil System_

The _Micrus Stretch-Resistant MicroCoil System_, marketed and sold by Micrus Corporation ("Micrus"), is an embolic coil delivery system that utilizes a thermal detachment system.  The Food and Drug Administration ("FDA") approved the _Micrus Stretch-Resistant MicroCoil System_ on October 22, 2002, more than one year before the earliest alleged priority date of the Asserted Patents. _See,_    FDA    510(k)    No.    K022420,    _available    at_ https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMN/pmn.cfm?ID=K022 420.  The _Micrus Stretch-Resistant MicroCoil System_ and related publications are

therefore prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least 35 U.S.C. §102(a) and 35 U.S.C. §102(b).

### 2.    Target Therapeutics' *TARGET*® *System*

The *TARGET*® *System*, marketed and sold by Target Therapeutics ("Target"), is an embolic coil delivery system that utilizes an electrolytic detachment system to deliver Guglielmi Detachable Coils ("GDC"). The FDA approved the *TARGET System* on September 8, 1995. *See* FDA 510(k) No. K951256, *available at* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K951256. The *TARGET*® *System* and related publications are therefore prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least 35 U.S.C. §102(a) and  35 U.S.C. §102(b).

### 3.    MVI's *MicroPlex*® *Coil System,  HydroCoil*® *Embolic System, HydroLink*® *Delivery System, and V-Trak*® *Delivery System*

The *MicroPlex Coil System*, marketed and sold by MVI, is an embolic coil delivery system that utilizes a hydraulic delivery mechanism to deliver MVI's MicroPlex® Coils. MVI also markets and sells the *HydroCoil*® *Embolic System* and the *HydroLink*® hydraulic delivery mechanism. These systems consist of implantable coils attached to fluid injection delivery system. The FDA approved the *HydroLink*®  delivery system on September 6, 2002, more than one year before the earliest alleged priority date of the Asserted Patents. *See* FDA 510(k) No.              K022735,              *available              at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMN/pmn.cfm?ID=K022735*. These systems and related publications are therefore prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least 35 U.S.C. §102(a) and 35 U.S.C. §102(b).

Additionally, MVI's *V-Trak*® delivery system was launched at least as early as February 28, 2006. *See* BIOSPACE, *MicroVention, Inc. to be Acquired by*

Exhibit 1
-23-

*Terumo Corporation*, *available at* https://www.biospace.com/article/releases/microvention-inc-to-be-acquired-by-terumo-corporation-/.   MVI's *V-Trak®* delivery system and related publications are therefore prior art to the '338 Patent under at least 35 U.S.C. §102(a) and  35 U.S.C. §102(b).   Balt's investigation regarding the earliest use of V-Trak® delivery system remains ongoing, and Balt reserves the right to supplement.

### 4.   Cordis Neurovascular, Inc.'s *TRUFILL® DCS Orbit System*

The TRUFILL® DCS Orbit System, marketed and sold by Cordis Neurovascular, Inc. ("Cordis"), is an embolic coil delivery system that uses *TRUFILL®* detachable coils and the *TRUFILL®* detachable DCS Syringe.  The *TRUFILL® DCS Orbit System* obtained FDA approval on June 20, 2003, more than one year before the earliest alleged priority date of the Asserted Patents. *See* FDA 510(k) No. K030963, *available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMN/pmn.cfm?ID=K0309 63*.  The *TRUFILL® DCS Orbit System* and the related publications are therefore prior art to the '506 Patent, the '819 Patent, and the '338 Patent under at least 35 U.S.C. §102(a) and  35 U.S.C. §102(b).

## III. RELEVANT LEGAL STANDARDS

### A.   Anticipation Under 35 U.S.C. § 102

35 U.S.C. § 102(a), § 102(b), and § 102(e) state:

A person shall be entitled to a patent unless —
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
…
(e) the invention was described in — (1) an application for patent, published under section 122(b), by another filed in the United

Exhibit 1
-24-

States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language

The Asserted Claims are anticipated under 35 U.S.C. § 102 for at least the reasons described below.

**B.    Obviousness under 35 U.S.C. § 103**

35 U.S.C. § 103(a) states "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

As the United States Supreme Court held in *KSR Int'l Co. v. Teleflex Inc.*, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." 127 S. Ct. 1727, 1739 (2007). The Supreme Court further held that "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 1740.

/ / /

Exhibit 1
-25-

Moreover, the Supreme Court held that "in many cases a person of ordinary skill would be able to fit the teachings of multiple patents like pieces of a puzzle." *Id.* at 1742. Indeed, the Supreme Court held it is sufficient that a combination of elements was "obvious to try" holding that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *Id.*

Further, there are various reasons the skilled artisan would combine these references. For example, the POSITA would simply be combining prior art elements according to known methods to yield predictable results. Additionally, various motivations to combine the prior art references discussed herein are found, explicitly or implicitly, in one or more of the following:

- A person of ordinary skill in the art's own knowledge or common sense;
- The prior art references themselves;
- The subject matter acknowledged as prior art in the Patents-in-suit;
- The interrelated teachings of the multiple prior art references identified herein;
- The nature of the problem purportedly solved by the Patents-in-suit;
- The ability to implement the alleged invention as a predictable variation of the prior art;
- Improvements in similar delivery devices;
- Any needs or problems known in the field and purportedly addressed by the Patents-in-suit;
- The number of predictable solutions to the problem(s) purportedly addressed by the Patents-in-suit;

Exhibit 1
-26-

- • Reasonable expectations of a person having ordinary skill in the art that known prior art elements would maintain their respective properties or functions when they were combined;

- • Express or implied reasons known by a person having ordinary skill in the art to combine known prior art elements and knowledge of how to combine those known prior art elements;

- • Expectation that known prior art elements were capable of being combined, as well as the expectation that the combination would have worked for their intended purpose;

- • Express and/or implied teachings from the prior art as to why a person of ordinary skill would have combined known elements; and

It is obvious to try a combination of prior art elements where the options to solve a known problem were finite and predictable.

Below, Balt list exemplary possible obviousness combinations. These exemplary combinations should not be construed to suggest that any reference or sub-combination of references included in these combinations would not alone have rendered the asserted claims obvious. The provided combinations are not exhaustive. Balt reserves the right to rely on additional or alternative obviousness combinations, particularly after the court construes the Asserted Claims and as Balt's investigation continues.

## C.    Written Description & Enablement under 35 U.S.C. § 112, First Paragraph

35 U.S.C. §112, paragraph 1, requires that the specification "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." Written description and enablement are separate

- 18 -

Exhibit 1
-27-

and distinct requirements.

The test for written description is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (quoting *Ralston Purina Co. v. Far-Mar-Co., Inc.,* 772 F.2d 1570, 1575 (Fed. Cir. 1985). The disclosure, considered as a whole, "must convey to one of ordinary skill in the art, either explicitly or inherently, that [the inventors] invented the subject matter claimed" in the patent application. *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1346 (Fed. Cir. 2000). "Such description need not recite the claimed invention *in haec verba* but must do more than merely disclose that which would render the claimed invention obvious." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1377 (Fed. Cir. 2009).

The test for enablement is whether, upon reading the specification and in view of information known in the art, a person of ordinary skill in the art could make or use the invention without undue experimentation. *See Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1374 (Fed. Cir. 2005); *see also In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988) (providing non-exhaustive list of factors to be considered in the enablement analysis).

## IV.  LEVEL OF ORDINARY SKILL IN THE ART

The analyses presented herein are provided from the perspective of a person having ordinary skill in the relevant art during the relevant time period. For purposes of these contentions, the relevant art is the art of implantable endovascular devices and delivery systems. For purposes of these contentions, Balt relies on MVI's earliest alleged priority date of the Asserted Claims as the basis for the relevant time period, or May 27, 2005.

A person of ordinary skill in the art of implantable endovascular devices and delivery systems in or around May 2005 would have had a Bachelor's or

Exhibit 1
-28-

Master's degree in biomedical engineering, mechanical engineering, or a related discipline, with at least two years of experience designing and/or developing endovascular devices.

Balt reserves its right to evaluate Plaintiff's proposed level of ordinary skill, if and when it is provided in this case, and to respond accordingly. Likewise, Balt reserves its right to modify these contentions in view of Plaintiff's proposed level of ordinary skill, if and when it is provided in this case.

## V.  STATE OF THE RELEVANT ART AS OF THE EARLIEST ALLEGED PRIORITY OF THE ASSERTED CLAIMS, MAY 27, 2005

### A.  Microcoil Embolic Devices Were Well-Known

The use of coil embolic devices to prevent hemorrhagic stroke through the treatment of brain aneurysms dates back to at least as early as the 1990s. Guido Guglielmi, et al, *Carotid-cavernous fistula caused by a ruptured intracavernous aneurysm: endovascular treatment by electrothrombosis with detachable coils*, NEUROSURG., 31:591–597 (1992); Guido Guglielmi, et al, *Electrothrombosis of saccular aneurysms via endovascular approach. Part 2: Preliminary clinical experience. Special article,* J. NEUROSURG., 75:8–14 (1991); Guido Guglielmi, et al, *Electrothrombosis of saccular aneurysms via endovascular approach. Part 1: Electrochemical basis, technique, and experimental results. Special article,* J. NEUROSURG., 75:1–7 (1991). Long before the alleged priority date of the '506 Patent, May 27, 2005, Target Therapeutics and its engineers were working alongside interventional neuroradiologists, including Guido Guglielmi, to develop novel techniques for aneurysm treatment. *Id.*; Guido Guglielmi, et al, *Endovascular treatment of posterior circulation aneurysms by electrothrombosis using electrically detachable coils,* J. NEUROSURG., 77:515–524 (1992). This work resulted in the development of the Guglielmi Detachable Coil ("GDC"). Guido Guglielmi et al, *Carotid-cavernous fistula caused by a ruptured intracavernous aneurysm: endovascular treatment by electrothrombosis with*

Exhibit 1
-29-

*detachable coils,* 31:591–597; Guido Guglielmi et al, *Electrothrombosis of saccular aneurysms via endovascular approach. Part 2: Preliminary clinical experience. Special article.* 75:8–14.    Boston Scientific acquired Target Therapeutics in 1997 and has continued to develop detachable coil technologies. *See* Lawrence M. Fisher, *Boston Scientific to Acquire Specialized Catheter Maker*, THE NEW YORK TIMES, Section D, Page 2, Jan. 21, 1997.

The original GDC was a platinum helical microcoil that was attached to an elongated pusher and delivered to the target site of treatment.  Guido Guglielmi et al, *Carotid-cavernous fistula caused by a ruptured intracavernous aneurysm: endovascular treatment by electrothrombosis with detachable coils*, 31:591–597. After positioning within the treatment site, the GDC was detached from the pusher via an electrolytic detachment mechanism. *Id.*  The FDA approved the GDC system for commercial sale in September, 1995.  Suzanne Morrison, *Guglielmi detachable coils: an alternative therapy for surgically high-risk aneurysms*, J. NEUROSCI. NURS., 4:232-7 (1997).  An image of a GDC coil is shown below.



*Fig. 1. is a GDC coil mounted to the stainless steel delivery wire prior to detachment. (Actual coil size varies; in this diagram, it is less than one-half inch.)*

*Id.* An example of an in-vivo use of GDC coils is shown below.

Exhibit 1
-30-

Figure 3. Plain x-ray film (lateral projection) showing two platinum coils (total length 35 cm) detached inside the aneurysm (*arrows*).

Guido Guglielmi et al, *Carotid-cavernous fistula caused by a ruptured intracavernous aneurysm: endovascular treatment by electrothrombosis with detachable coils*, Fig. 3.

**B.    Delivery Pushers Were Well-Known**

The ability to safely deliver coil embolic devices to the target vasculature has always been critical to the success of aneurysm treatments. However, because the typical target area for a coil embolic device is an aneurysm sac within the patient's brain, developers had to devise improved delivery systems capable of navigating the small and highly tortuous and sensitive vasculature of the brain. Navigating complex vascular anatomy of a patient, even when healthy, was difficult, time consuming and often frustrating. *See Whittaker*, ¶ [0005]. The difficulty of navigation was compounded when vessels were narrowed or obstructed by disease. *Id.* The development and use of vascular guidewires and/or guide catheters as pusher devices allowed physicians to visualize the device outside the body, through the use of continuous low-dose fluoroscopy. *Id.*

Well before the earliest alleged priority date of the Asserted Claims, variations of delivery pushers had been developed to deliver implantable microcoils to the target vasculature. For example, in the mid-1980s, Target

Exhibit 1
-31-

1   Therapeutics devised the Tracker, a variable stiffness micro catheter, which used

2   a pusher member for the delivery of embolic devices.  Kikuchi Y, Strother CM,

3   Boyer M: *New catheter for endovascular interventional procedures*. RADIOLOGY,

4   165:870–871, 1987.  The Tracker was capable of avoiding arterial bifurcations by

5   pushing a microcatheter over a steerable microguidewire.  *Id.*

6       More recent versions of delivery pushers that nonetheless predate the

7   alleged priority of the Asserted Claims, were manufactured and sold by

8   companies like Micrus, Cordis, and MVI, among others.  For example, the *Micrus*

9   *Stretch-Resistant MicroCoil System* included a delivery pusher, referred to as the

10  "Device Positioning Unit" or "DPU," which was detachably coupled to a stretch-

11  resistant microcoil implant at its distal end.  *See* FDA 510(k) No. K022420.  The

12  DPU allowed the physician to advance the microcoil implant into the patient's

13  neurovasculature, wherein the physician could position and detach the microcoil

14  implant using a detachment control box connected via electrical leads to a

15  resistive coil heater at the distal end of the DPU.  *Id.*  The Micrus device, and

16  others like it, were the subject of various patents and patent applications years

17  before the alleged priority of the Asserted Claims.  *See, e.g.*, *Gandhi I; Wilson;*

18  *Cox; Taki; Ogawa; Whittaker*.

19  **C.    Alternative Detachment Mechanisms Were Well-Known**

20      A variety of detachment mechanisms to release endovascular implants

21  from delivery pushers were developed years before the alleged priority of the

22  Asserted Claims.  One of the earliest examples is the electrolytic detachment

23  system of Target Therapeutics' *Target® System*, which was being used as early as

24  1995.  *See* Guido Guglielmi, et al, *Carotid-cavernous fistula caused by a ruptured*

25  *intracavernous aneurysm: endovascular treatment by electrothrombosis with*

26  *detachable coils*. 31:591–597;  Guido Guglielmi et al, *Electrothrombosisof*

27  *saccular aneurysms via endovascular approach. Part 2: Preliminary clinical*

28  *experience. Special article.* 75:8–14; *See* Pham, *Electrolytically severable joint*

*for endovascular embolic devices* (filed November 3, 1993).  Indeed, the GDC coils were originally named GEMs (Guglielmi Electrolytic Microcoils). *See* Guglielmi, *History of the genesis of detachable coils*, J. NEUROSURG., 111:6, Fig. 7.  Each of the Asserted Patents discloses such electrolytic detachment systems as well-known in the prior art.  *See, e.g.*, '506 Patent, 1:32-42 (citing, among others, U.S. Patent No. 5,108,407 to *Guglielmi*); '819 Patent, 1:32-42 (same); '338 Patent, 1:51-62 (same).

Other forms of detachment systems, including at least mechanical, thermal, and hydraulic, were also well-known and used well before the alleged priority of the Asserted Claims.  For example, mechanical release mechanisms are described in a number of prior art patents and patent applications.  *See, e.g.*, *Engelson*. Hydraulic detachment systems were also well-known long before the alleged priority of the Asserted Claims.  Such systems included MVI's *HydroLink*® detachment system and Cordis' *TRUFILL*® detachment system.  FDA 510(k) No. K022735 (Hydrolink®, 2002); FDA 510k No. K030963 (TRUFILL®, 2003).

Thermal detachment systems, such as the *Micrus Stretch-Resistant MicroCoil System*, were also in use at least as early as 2002.  *See* FDA 510(k) No. K022420; *Gandhi I*; *Wilson*; *Cox*; *Taki*; *Ogawa*.  MVI's own thermal detachment system, the *V-Trak*® delivery system, was commercially available around February 28, 2006.  BIOSPACE, *MicroVention, Inc. to be Acquired by Terumo Corporation*, https://www.biospace.com/article/releases/microvention-inc-to-be-acquired-by-terumo-corporation-/.   These thermal detachment systems used electrically-activated heating elements to melt and sever connecting joints or tether structures.  For example, *Gandhi I* and *Wilson* each discloses a device that uses a heating element to break a tether connecting the microcoil implant to the pusher:

/ / /

/ / /

Exhibit 1
-33-





*Gandhi I*, Figs. 4, 6.





*Wilson*, Figs. 4-5.

Each of the Asserted Patents also acknowledge and disclose the prior art's use of thermal detachment systems, such as *Geremia*, *Gandhi II*, and *Handa*, all of which were available well before to May 27, 2005. '506 Patent, 1:32-42; '819 Patent, 1:32-42; '338 Patent, 1:51-62.

All of these prior art thermal detachment systems used conductive elements to transmit current from an external power source to the electrically activated detachment mechanism. For example, *Taki* and *Ogawa* describe a conductive

core along the length of the delivery pusher that transmits a monopolar high-frequency current to heat a heat-severable joint at the distal end of the delivery device. *See, e.g.*, *Ogawa,* 2:37-44. *Gandhi I* and *Wilson* disclose the use of electrical conduits running the length of the delivery pusher to activate a resistive heating element at the distal end of the delivery pusher. *See, e.g.*, *Gandhi I*, Figs. 4-6; *Wilson*, Figs. 4-5. These, and other prior art systems, also emphasized the need to prevent thermal damage from surrounding body tissues during use, and thus disclose insulating components to shield tissues from heat generated by the electrical connectors and/or heating elements of the devices. *See, e.g.*, *Ogawa*, 2:51-52; *Gandhi I*, 2:23-28. In addition, these prior art systems disclosed various structures to enable the connection of the delivery pusher to an external power source, such as coaxial connections. *See, e.g.*, *Ogawa*, 4:24-29; *Whittaker*, Fig. 1F; *Mirigian*, Figs. 3-5. Examples of such structures are shown below:



**FIG. 1F**

*Whittaker*, Fig. 1F.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Exhibit 1
-35-



*Mirigian*, Figs. 3-5.

Moreover, as previously described, products such as the *Micrus Stretch-Resistant Microcoil System*, which were on the market years before the earliest alleged priority date of the Asserted Patents, incorporated similar conductive and insulative components. *See* FDA 510(k) No. K022420.

## D.    Stretch-Resistant Microcoils Were Well-Known

Other aspects of detachable coil technologies were being developed in parallel with the work being done on detachment mechanisms, all before the earliest alleged priority date of the Asserted Claims, May 27, 2005. For example, users of detachable microcoils had sometimes observed that, when attempting to reposition the microcoil implant within the target site, the microcoil might stretch and lose its helical shape, or even break. *See Wilson*, ¶ [0006]. This sometimes occurred because the microcoils "are extremely flexible and have very little

Exhibit 1
-36-

structural integrity." '338 Patent at 1:42-43.  When these issues occurred, the treating physician would often be required to remove the microcoil entirely and repeat the procedure with a new microcoil.  *See Wilson*, ¶ [0006].

To solve this problem, developers, well before the alleged priority of the Asserted Claims, came up with mechanisms to impart stretch-resistance into the helical microcoils, such as through the use of stretch-resistant metal wires of polymer fibers that ran the length of the lumen of the microcoil and were attached to the microcoil and/or delivery pusher.  '338 Patent at 1:42-51 (identifying *Ken* and *Wilson* as prior art); *see also Wilson,* ¶ [0009].  These stretch-resistant members reduced the risk of breakage and prevented the coils from stretching during retrieval, relocation, or repositioning after initial deployment.  *See Ken*, Abstract; *see also Wilson*, ¶ [0006].  An example of a stretch-resistant microcoil disclosed in *Ken* is shown below.



Fig. 1A

*Ken*, Fig. 1A.

In view of these improvements, the desirability of imparting stretch-resistance to reduce the risk of microcoil breakage and to provide a safety factor during retrieval and relocation, was well-known in the industry by the of the alleged priority of the Asserted Claims.  *Wilson*, ¶ [0006].  Indeed, several years prior to the filing of the Asserted Patents, companies such as Micrus were manufacturing and selling stretch-resistant microcoils.  *See, e.g.*, FDA 510(k) No. K022420 (microcoil fabricated from platinum alloy wire and including a non-absorbable polypropylene or polyethylene suture inserted inside the primary wind coil to create stretch resistance).

### E.    Reducing Implant Detachment Time Was A Common Goal

Well before the earliest priority date of the Asserted Claims, reducing implant detachment time had become a common goal for developers of microcoil embolic delivery devices.  *See* Guglielmi, *History of the genesis of detachable coils*, 111:5.  Early prior art systems, such as those that employed electrolytic detachment mechanisms, often required several seconds, or even minutes, to detach a single coil from the delivery pusher.  *See Ogawa*, 1:60-2:21 (describing drawbacks of electrolytic detachment mechanisms).  Depending on the size of the aneurysm being treated, a single intervention might require the use of numerous microcoils to fill the aneurysm sac.  *Id.*  Thus, long detachment times increased the overall length of the procedure, and thereby increased the potential physical burdens on both the patient and the physician.  *Id.*  Moreover, electrolytic detachment systems could also cause the release of potentially harmful particles into the bloodstream and/or create a risk of thermal damage to surrounding tissues.  Many of the alternative detachment mechanisms discussed above were intended to resolve some of these issues.

For example, in FDA documents associated with the *Micrus Stretch-Resistant MicroCoil System*, Micrus touts reduced detachment time as a benefit of the system over predicate devices. *See* FDA 510(k) No. K022420 (noting reduction of detachment time from 10 seconds to 5 seconds).  The heat-severable joint of *Ogawa* is another example of a system with the goal of rapid detachment.  Indeed, *Ogawa* discloses a working example that achieved instantaneous detachment of the coil implant.  *Ogawa*, 7:12-18; *see also Taki*, 6:39-41.  Other prior art devices also noted the desirability of using reducing implant detachment times, and disclosed various mechanisms to achieve that goal.  *See, e.g.*, *Cox*, ¶ [0039] (disclosing use of stored mechanical energy to accelerate implant detachment).

/ / /

Exhibit 1
-38-

# VI.  INVALIDITY OF THE ASSERTED PATENTS UNDER 35 U.S.C. §§ 102, 103, AND/OR 112

The Asserted Claims of the '506 Patent, the '819 Patent, and the '338 Patent, as properly construed, are invalid at least because they are anticipated under 35 U.S.C. § 102 and/or obvious under 35 U.S.C. § 103 in view of the prior art.  In addition to the invalidity arguments described below, exemplary claim charts for the '506 Patent, the '819 Patent, and the '338 Patent are attached hereto as Appendix A-E, respectively.

In this regard, Balt may rely on cited or uncited portions of the prior art, other documents, and expert testimony to establish (1) that a person of ordinary skill in the art would have been motivated to combine the prior art so as to render the claim invalid as obvious, (2) the state of the relevant art, and (3) the general knowledge of one of skill in the art.  Furthermore, to the extent that similar claim limitations occur in one or more claims, the disclosures below applied to a given claim should be read to apply to all similar claim limitations, as should the prior art descriptions above.

## A.  General Grounds Applicable to Each of the Asserted Patents

To the extent any limitation of any of the Asserted Claims of any one of Asserted Patents is construed to have a similar meaning, or to encompass similar feature(s) and/or function(s), as any other claim limitation of any of the Asserted Patents, and to the extent at least one claim chart in the Appendix identifies any prior art reference, or a portion thereof, as disclosing or teaching such similarly construed claim limitation, such identified prior art reference, or the portion thereof, and Balt's contentions with respect to such claim limitation and such prior art reference as found in such claim chart, are incorporated by reference and are part of Balt's invalidity contentions with respect to each of the Asserted Patents that includes such similarly construed claim limitation.

For any contention that a claim is anticipated by prior art, Balt also

Exhibit 1
-39-

contends that the prior art renders that claim obvious under 35 U.S.C. § 103. In particular, each anticipatory prior art reference may be combined with (1) information known to persons skilled in the art at the time of the alleged invention, (2) any other anticipatory prior art reference, and/or (3) any of the additional prior art identified above.

Where a combination of prior art renders a claim obvious, a motivation to combine such items is identified below. As clarified by the United States Supreme Court in *KSR International Co. v. Teleflex Inc.*, however, a claimed invention can be obvious even if there is no teaching, suggestion, or motivation for combining the prior art to produce that invention. 127 S. Ct. 1727, 1741 (2007). In view of the *KSR* decision, the U.S. Patent and Trademark Office incorporated Examination Guidelines in the Manual of Patent Examination Procedure ("MPEP"). Those Guidelines identify various rationales for finding a claim obvious, including those based on other precedents. Those rationales include:

(A) Combining prior art elements according to known methods to yield predictable results;

(B) Simply substituting one known element for another to obtain predictable results;

(C) Using a known technique to improve similar devices (methods, or products) in the same way;

(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;

(E) Choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

(F) Using known work in one field of endeavor to prompt variations of such work for use in either the same field or a different field based on design incentives or other market forces if the variations would have been predictable to

Exhibit 1
-40-

one of ordinary skill in the art;

(G) Finding some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

MPEP § 2141.  In summary, if a person of ordinary skill can implement a predictable variation of the prior art to achieve a claimed invention, 35 U.S.C. § 103 bars the claim's patentability.

The prior art reference cited herein is within the field of the patentee's endeavor or is at least reasonably pertinent to the field with which the patentee was concerned, that is, implantable endovascular devices and delivery systems. Because the Asserted Patents simply arrange elements found in the prior art, with each performing the same function it had been known to perform, and yield no more than what one would expect from such an arrangement, the combinations of prior art are obvious.  *KSR*, 127 S. Ct. at 1742.

Further, in the prior art, there were well-recognized design needs and market pressures to develop the claimed methods and apparatuses for endovascular surgery.  Such design needs and market pressures provide ample reason to combine prior art elements in the manner combined.  *KSR*, 127 S. Ct. at 1742.  Moreover, because there were a finite number of predictable solutions, a person of ordinary skill in the art had good reason to pursue the known options. *Id*.  Indeed, a person skilled in the art would have been familiar with all the claim elements that the patentee used to distinguish the prior art during prosecution. The above-identified prior art references merely use those familiar elements for their primary or well-known purposes in a manner well within the ordinary level of skill in the art.  Accordingly, common sense and the knowledge of the prior art render the claims invalid under either 35 U.S.C. § 102 or § 103.

Moreover, a person of ordinary skill would have perceived a reason to combine the above prior art based on the nature of the problem to be solved, the

Exhibit 1
-41-

teachings of the prior art, and the knowledge of persons of ordinary skill in the art. The identified prior art addresses the same or similar technical issues and suggests the same or similar solutions to those issues. *See In re Inland Steel Co.*, 265 F.3d 1354, 1362 (Fed. Cir. 2001). Some of the prior art refers to or discusses other prior art, illustrating the close technical relationship among the prior art.

Therefore, for every prior art reference identified above, it would be obvious to combine that prior art reference with any other prior art reference identified above. It would also be obvious to combine that prior art reference with any combination of the prior art references identified above.

## B.    Invalidity of the '506 Patent Under 35 U.S.C. §§ 102 & 103

The Asserted Claims of the '506 Patent, as properly construed and/or if construed to cover Balt's accused Optima Coil System, are invalid at least because they are anticipated under 35 U.S.C. § 102 and/or obvious under 35 U.S.C. § 103 by the prior art. In addition to the invalidity arguments described below, exemplary claim charts for the '506 Patent are attached hereto as Appendix A & B.

### 1.    The Asserted Claims Are Invalid Under 35 U.S.C. § 102

At least claims 1-5, 8, 13-16, and 18 of the '506 Patent are anticipated under 35 U.S.C. § 102 by *Wilson*, as demonstrated in the claim chart attached as Appendix A to these contentions.

### 2.    The Asserted Claims Are Invalid Under 35 U.S.C. § 103

All the Asserted Claims of the '506 patent would have been obvious based on *Wilson* alone, or in combination with the knowledge of a person of ordinary skill in the art and/or other prior art references.

Balt sets forth below specific combinations of prior art that render the Asserted Claims of the '506 Patent obvious. These prior art combinations are not exhaustive. Rather, they are illustrative examples of prior art combinations using the prior art disclosed generally above. To the extent MVI contends that any of

Exhibit 1
-42-

the cited prior art fails to disclose one or more limitations of the Asserted Claims, Balt reserves the right to identify other prior art references that, when combined with the other prior art, would render the claims obvious despite the allegedly missing limitation. In addition to the invalidity arguments described below, exemplary claim charts for the '506 Patent are attached hereto as Appendix B.

### a. *Wilson* alone, in view of the knowledge of a person of ordinary skill in the art

As discussed above and demonstrated in the claim chart attached as Appendix A, *Wilson* anticipates each of the Asserted Claims of the '506 Patent under 35 U.S.C. § 102. However, to the extent it is determined that *Wilson* does not anticipate one or more of the Asserted Claims, the Asserted Claims would have been obvious under 35 U.S.C. § 103 over *Wilson* alone in view of the knowledge of a skilled artisan as of the earliest alleged priority date of the '506 Patent.

*Wilson* discloses an implant delivery system comprising a helical microcoil implant (10) detachably connected to a delivery pusher (24) via a tether (18), as shown in Figure 4 below.



FIG. 4

*Wilson* further discloses reinforcement of the implant (10) with the stretch-resistant tether (18) both reduces the risk of coil breakage during withdrawal and relocation and allows the coil implant to be pushed even when partially deployed. *See, e.g.*, *Wilson*, ¶¶ [0006]-[0007]. Because the tether (18) is secured at its

Exhibit 1
-43-

proximal end (37) within the lumen of the delivery pusher, and at distal end (14) to the implant, a skilled artisan would have understood the tether would be in a pre-tensioned state.

Moreover, given that *Wilson's* tether is "formed from fiber, plastic or other polymer" (*Wilson*, ¶ [0030]), a skilled artisan would have understood that the tension in the tether would be below the elastic limit of the material for several reasons. First, a skilled artisan would have understood that, due to the resilience of the polymer fiber material of the tether, maintaining a state of tension below the elastic limit of the polymer fiber would cause the tether to store potential energy, akin to a spring. *See* Ozkaya, Nihat, and Margareta Nordin, *Fundamentals of Biomechanics: Equilibrium, Motion, and Deformation*, 2d Ed., New York: Springer, 1999, at Chapter 7 (hereinafter, *"Ozkaya"*). Second, a skilled artisan would have understood that such potential energy would create an axial force between the distal and proximal ends of the tether that would resist axial stretching in the distal direction. *Id.* Third, a skilled artisan would have known that any tension above the elastic limit of the material would permanently deform the material and eliminate its stretch-resistant properties. *Id.* This, in turn, would destroy the benefit of imparting stretch-resistance on the microcoil implant. *See Wilson,* ¶¶ [0006], [0023] (describing advantages of stretch-resistant coils).

Finally, to the extent Wilson does not already disclose a pre-tensioned tether, a skilled artisan would have known that pre-tensioning *Wilson's* tether would accelerate detachment, and, would have had a reasonable expectation of success that pre-tensioning *Wilson's* tether would result in near instantaneous detachment of the implant. Indeed to overcome a 35 U.S.C. § 112 enablement objection during prosecution of the '506 Patent, the applicant admitted that the claimed pre-tensioned tether and near instantaneous detachment time were enabled because:

Exhibit 1
-44-

one skilled in the art would understand that, for a given tether material, one could tension the material below the elastic limit of the material such that an electrical heating element, which begins heating nearly instantaneously, will result in a release of the delivery pusher less than 1 second (in the case of claim 1) or before the outer surface of the pusher exceeds about 50 °C (in the case of claim 19), after activation of the electrical heating element.

Applicant Argument/Remarks Made in Amendment, June 27, 2008. Thus, applying tension to *Wilson's* tether merely represents a known solution to a known problem.

> **b.** **_Wilson_, in combination with one or more of _Gandhi I_, _Kester_, Cox, _Taki_, Ogawa, and/or the _Micrus Stretch-Resistant MicroCoil System_**

To the extent it is determined that *Wilson* neither anticipates one or more of the Asserted Claims, nor renders one or more of the Asserted Claims obvious in view of the knowledge of a skilled artisan, the Asserted Claims would have been obvious under 35 U.S.C. § 103 over *Wilson* in view of one or more of *Gandhi I*, *Kester*, *Cox*, *Taki*, *Ogawa*, and/or the *Micrus Stretch-Resistant MicroCoil System*.

As discussed in Section V, above and incorporated herein by reference, implant delivery systems such as that claimed in the '506 Patent were well-known in the art as of the earliest alleged priority date of the '506 Patent. For example, each of *Wilson, Gandhi I*, *Cox*, *Taki*, and *Ogawa* disclose a helical microcoil implant detachably connected to a delivery pusher. *Wilson*, ¶ [0009], Figs. 4 and 5; *Gandhi I*, 6:40-59, Figs. 3-6; *Cox*, ¶ [0027], Figs. 1-2 ; *Taki*, 1:47-49, Fig. 1; *Ogawa*, 3:15-29, Fig. 1.

In both *Wilson* and *Gandhi*, the implant is connected to the delivery pusher via a tether. *Wilson*, ¶ [0009], Figs. 4 and 5; *Gandhi I*, 6:40-59. Both *Wilson* and *Gandhi* also disclose an implant delivery system wherein the implant is detached

Exhibit 1
-45-

from the delivery pusher by heat-induced breakage of the tether. *Wilson*, ¶ [0009]; *Gandhi I*, 6:60-7:6. In each reference, heat is applied to the tether by a resistive heater coil, driven by current from a power source external to the disclosed device. However, *Gandhi I* also discloses the application of tension to a heated connecting member in order to facilitate separation of an implant from a delivery catheter. *Id.* at 1:49-56.

Figs 4 and 5 of *Wilson* and Figs. 5 and 6 of *Gandhi I* are shown below, respectively.



*Wilson*, Figs. 4-5.



*Gandhi I*, Figs. 5-6.

Exhibit 1
-46-

Not only were implant delivery systems such as that claimed in the '506 Patent described in patents and published patent applications, but several companies had been making and selling such systems for years prior to the earliest alleged priority of the '506 Patent. For example, Micrus had received FDA approval for an implant delivery system that utilized a thermal detachment mechanism, known as the *Micrus Stretch-Resistant Microcoil System*, by October 2002. FDA 510(k) No. K022420 Summary (2002) (hereinafter "*K022420*"). Like the systems disclosed in *Wilson* and *Gandhi*, the *Micrus Stretch-Resistant Microcoil System* included a helical microcoil implant detachably connected to an elongated delivery pusher via a tether. *Id.* at 2-4. Similarly, the *Micrus Stretch-Resistant Microcoil System* employed a resistive heater coil to break the tether and deploy the implant. *Id.* Additionally, Micrus' FDA 510(k) submissions showed the *Micrus Stretch-Resistant Microcoil System* was successful in reducing detachment time. *See id.* at 4. Exemplary images of the connection structure of the *Micrus Stretch-Resistant Microcoil System* tether are shown below.



*Diagram of Micrus Stretch Resistant MicroCoil Socket/Ring Connection*



*Id.*

As discussed above, *Wilson* further discloses a tether pre-tensioned below its elastic limit to achieve implant detachment in less than one second after activation of the resistive heater coil.  *See* Section V.C and Section V.E, *supra.* Accordingly, the combination of *Wilson* and *Gandhi I* and/or the *Micrus Stretch-Resistant MicroCoil System* discloses each of the elements of the Asserted Claims of the '506 Patent.

A skilled artisan would have been motivated to combine *Wilson* with *Gandhi I* and/or the *Micrus Stretch-Resistant Microcoil System* for several reasons, with an expectation of success.  First, each of the references relates to a device that can deliver a detachable embolic coil.  Second, each of the references discloses a detachable embolic coil coupled to a delivery pusher by a tether. Third, each of the references further discloses a resistive heater element that, when activated, breaks the tether and causes the embolic coil to be deployed. Thus, the references address the same problem, are in the same field of endeavor, and use similar technology to achieve the purpose (i.e. deployment of a microcoil implant at the target site).  Moreover, a skilled artisan would have been aware of the industry's recognized need to minimize implant detachment time.  Thus, a skilled artisan would have been motivated to combine *Wilson* with *Gandhi I* and the *Micrus Stretch-Resistant Microcoil System* in order to optimize the detachment time of the implant disclosed in *Wilson*.

To the extent it is determined that *Wilson* does not disclose a tether pre-tensioned below its elastic limit to achieve implant detachment in less than one second, the corresponding elements of the Asserted Claims nonetheless would have been obvious over *Wilson*, *Gandhi I*, and/or the *Micrus Stretch-Resistant Microcoil System*, in view of *Taki, Ogawa, Cox,* and/or *Kester*.

*Gandhi I* discloses that the application of tension to a heated connecting member to facilitate separation of an implant from a delivery catheter was well-known in the endovascular arts.  *See Gandhi I*, 1:49-56 (describing

Exhibit 1
-48-

"conventional" detachment techniques for balloon implants from delivery catheters).  Likewise, *Kester* discloses using heaters to sever a pre-tensioned tether and thereby detach a restrained device.  *See Kester,* Fig. 5, 2:1-8.  Though *Kester* is in a different field, it constitutes analogous art because it is directed to the same problem as the '506 Patent, namely, rapid release of a device that has been restrained by a thermally degradable tether.

In addition, *Cox* discloses the desirability of using stored mechanical energy as a mechanism to accelerate detachment of an embolic coil implant from a delivery pusher.  *See* Cox, ¶ [0039].  In *Cox*, such mechanical energy storage was achieved by use of a spring, as shown in Figure 1 below.



Figure 1

A skilled artisan would have understood that, like a spring, an elastic tether under tension would also store mechanical energy that could be used to facilitate implant detachment.  *OZKAYA*, 7.7-7.8.  Finally, *Taki* and *Ogawa* disclose the desirability of accelerating detachment time of helical microcoil implants.  *See Taki*, 6:20-45; *Ogawa*, 2:1-3, 2:18-21.  Additionally, both *Taki* and *Ogawa* disclose working examples that achieved instantaneous detachment of microcoils by rapid melting of a detachment joint.  *Taki*, 7:16-18; *Ogawa*, 7:12-18.

Accordingly, in view of at least (1) *Gandhi I's* teachings regarding using tension to facilitate detachment of an implant, (2) *Kester's* teachings regarding pre-tensioning a tether to facilitate heat-induced breakage, and (3) *Cox's* teachings regarding the desirability of stored mechanical energy as a means to accelerate detachment of an implant from a delivery pusher, a skilled artisan

Exhibit 1
-49-

would have been motivated to pre-tension *Wilson's* tether below its elastic limit to accelerate detachment of the implant from the delivery pusher. Thus, a skilled artisan would have been motivated to combine *Wilson* with the teachings of *Gandhi I, Kester, and Cox* in order to optimize the delivery speed of the implant disclosed in *Wilson* in order to achieve the industry's recognized need to decrease detachment time.

Moreover, in view of *Taki's* and *Ogawa's* teachings of detachment mechanisms capable of instantaneous detachment of a microcoil implant, a skilled artisan would have had a reasonable expectation that pre-tensioning *Wilson's* tether would result in near instantaneous detachment of the implant. Indeed, to overcome a 35 U.S.C. § 112 enablement objection during prosecution of the '506 Patent, the applicant admitted that the claimed pre-tensioned tether and near instantaneous detachment time were enabled because:

> one skilled in the art would understand that, for a given tether material, one could tension the material below the elastic limit of the material such that an electrical heating element, which begins heating nearly instantaneously, will result in a release of the delivery pusher less than 1 second (in the case of claim 1) or before the outer surface of the pusher exceeds about 50 °C (in the case of claim 19), after activation of the electrical heating element.

Applicant Argument/Remarks Made in Amendment, June 27, 2008.

Thus, the combination of prior art requires the modification of one known element (i.e. *Wilson's* tether) with a known technique (i.e. pre-tensioning), to obtain a predictable result (i.e. accelerated—or near instantaneous—detachment). And, applying tension to *Wilson's* tether merely represents one of a finite number of solutions to the known problem and goal of reducing implant detachment time in a thermally detachable delivery system. *See, e.g. Cox* (disclosing stored potential energy as a means to accelerate detachment time); *Gandhi I* (disclosing application of tension to facilitate implant detachment); *Kester* (disclosing pre-tensioned tether to facilitate detachment); *see also* '506 patent at 8:57-61

Exhibit 1
-50-

1 (discussing the use of a spring or a pre-tensioned tether as two solutions to
2 facilitate detachment).

3        Accordingly, a skilled artisan would have been motivated to combine the
4 above-mentioned references to create a device that employed a pre-tensioned
5 tether, and would have had a reasonable expectation of success of achieving
6 implant detachment in less than one second after activation of the resistive heater
7 coil.

8 **C.    Invalidity of the '819 Patent Under 35 U.S.C. § 103**

9        The Asserted Claims of the '819 Patent would have been obvious based on
10 *Wilson* in combination with the knowledge of a person of ordinary skill in the art
11 and/or other prior art references.

12       Balt sets forth below specific combinations of prior art that render the
13 Asserted Claims of the '819 Patent obvious.  These prior art combinations are not
14 exhaustive.  Rather, they are illustrative examples of prior art combinations using
15 the prior art disclosed generally above.  To the extent MVI contends that any of
16 the cited prior art fails to disclose one or more limitations of the Asserted Claims,
17 Balt reserves the right to identify other prior art references that, when combined
18 with the other prior art, would render the claims obvious despite the allegedly
19 missing limitation.  In addition to the invalidity arguments described below,
20 exemplary claim charts for the '819 Patent are attached hereto as Appendix C.

21   **1.    *Wilson* in combination with one or more of *Gandhi I*, *Kester*,**
22          **        *Cox*, *Taki*, *Ogawa*, *Whittaker*, the *Micrus Stretch-Resistant***
23          **        *MicroCoil System*, and/or *Scheldrup*, and the knowledge of a**
24          **        person of ordinary skill in the art.**

25       The Asserted Claims would have been obvious under 35 U.S.C. § 103 over
26 *Wilson* in combination with one or more of *Gandhi I*, *Kester*, *Cox*, *Taki*,
27 *Whittaker*, the *Micrus Stretch-Resistant MicroCoil System*, and/or *Scheldrup*, in
28 view of the knowledge of a skilled artisan as of the earliest alleged priority date

of the '819 Patent.

The Asserted Claims of the '819 Patent include most—if not all—of the limitations found in the claims of the '506 Patent. As illustrated in the claim chart attached as Appendix C, all of those limitations in the '819 Patent are disclosed in the prior art, and the asserted claims would have been obvious in view of the same prior art, and for the same reasons, as those discussed above with respect to the Asserted Claims of the '506 Patent. *See* Section VI.B, *supra*.

However, the claims of the '819 Patent differ from the '506 Patent in that they also include several limitations directed to the conductive elements of the claimed implant delivery devices. For example, representative claim 1 of the '819 Patent recites:

> "a conductive core member having an externally exposed portion at said proximal end for connection to a power source;
> an insulating layer disposed on at least a portion of said conductive core member near said proximal end; and,
> a conductive layer disposed on at least a portion of said insulating layer, and having an externally exposed surface for connection to the power source;
> wherein said conductive layer and said conductive core conduct an electrical current from said proximal end of said delivery pusher to said electrically activated implant release member … ."

As detailed below and illustrated in Appendix C, however, the claimed "conductive core member," "insulating layer," and "conductive layer" constitute nothing more than obvious combinations of known prior art elements. Accordingly, the Asserted Claims of the '819 Patent would have been obvious in view of the prior art.

*Ogawa* discloses a conductive core having an externally exposed portion at the proximal end for connection to a power source. *See Ogawa*, 2:37-44. *Ogawa* also discloses an insulating layer disposed on top of a portion of the conductive layer. *Id.* at 2:51-52 ("surface of the [conductive core member] should preferably be covered with an electrically insulating coating"). *Ogawa* also

Exhibit 1
-52-

discloses an externally exposed surface for connection to a power source at the proximal end of the conductive core. *Id.* 4:24-29. Accordingly, *Ogawa* discloses each of the elements of the '819 Patent that do not appear in the '506 Patent, and are not otherwise explicitly disclosed in the prior art identified in connection with the '506 Patent, as discussed in Section VI.B above and incorporated herein by reference.

A skilled artisan would have been motivated to employ the conductive elements of *Ogawa* on the implant delivery system of *Wilson* for several reasons. First, each of the references relates to a device that can deliver a detachable embolic coil. Second, each of the references discloses a detachable embolic coil coupled to a delivery pusher. Third, each of the references further discloses implant detachment mechanisms that rely on melting of a polymer connector. Thus, *Wilson* and *Ogawa* address the same problem, are in the same field of endeavor, and use similar technology to achieve the purpose (i.e. deployment of a microcoil implant at the target site). Moreover, a skilled artisan would have been motivated to combine *Wilson* with the teachings of *Ogawa* to optimize the device's connection to an external power source by providing conductive and insulative components for improved transmission of electric current from the external power source to *Wilson's* electrically activated heater coil.

To the extent *Ogawa* is determined not to teach the conductive core, insulating layer or conductive layer recited in the Asserted Claims of the '819 Patent, Balt identifies *Whittaker* as additional prior art. *Whittaker* discloses a conductive core member having an externally exposed portion at the proximal end for connection to a power source. *Whitakker*, ¶¶ [0023], [0024], [0028]. *Whittaker* also discloses an insulating layer (10) disposed on a portion of the conductive core near the proximal end, which "can be selectively removed" to provide "an electrically conductive exposed surface that nevertheless maintains electrical separation from any inner structures," as shown in Figure 1A below.

Exhibit 1
-53-



**FIG. 1A**

*Whittaker*, Fig. 1A; *see also id.* at ¶ [0048].

*Whittaker* further discloses a conductive layer having an externally exposed surface for connection to a power source, as shown in Figure 1F:



**FIG. 1F**

*Whittaker*, Fig. 1F; *see also id.* at ¶ [0051].

A skilled artisan would have been motivated to employ the conductive elements of *Whittaker* on the implant delivery system of *Wilson* for several reasons. First, both references disclose endovascular treatment devices with electrically activated mechanisms at the distal end. Second, *Whittaker's* disclosed structure is capable of implementation on elongated catheter delivery devices designed for navigation through tortuous vasculature. This is precisely the working environment of the implant delivery device of *Wilson*. Third, like the closed electrical circuit of *Wilson*, *Whittaker's* structure would have avoided the need for external grounding of the electrical circuit, which was recognized to be a drawback of certain prior art detachment systems. *See Gandhi I*, 2:9-22 (describing problems of thermal damage and unwanted release of particulate matter associated with conventional techniques where patient must be grounded). Accordingly, a skilled artisan would have been motivated to combine *Wilson* with

Exhibit 1
-54-

the teachings of *Whhitaker* to optimize the device's connection to an external power source by providing conductive and insulative components for improved transmission of electric current from the external power source to *Wilson's* electrically activated heater coil.

Moreover, the use of conductive elements, separated by an insulating layer, to conduct an electrical current down the length of an endovascular device was within the knowledge of a skilled artisan as of the earliest alleged priority of the '819 Patent.  Indeed, *Wilson*, *Gandhi I*, *Cox*, and the *Micrus Stretch-Resistant MicroCoil System* all used conductive elements to transmit electrical current from the proximal end of the delivery pusher to the electrically activated detachment mechanism at the distal end. *Wilson*, ¶ [0029]; *Gandhi I*, 3:54-63, 5:56-6:13; *Cox*, ¶ [0034]; *K022420*, 4.  Accordingly, the proposed modification would merely require the combination of known elements (i.e. *Ogawa's* and/or *Whittaker's* conductive core, insulating layer, and conductive layer) with other known elements (i.e. *Wilson's* delivery pusher, heater coil, and tether) to obtain a predictable result (i.e. rapid transfer of electrical current to an electrically activated heater element).

The conductive elements described above appear in each of the asserted independent claims of the '819 Patent.  However, MVI has also asserted dependent claim 18, which further recites "a circuit associated with said release mechanism that monitors a number of detachments performed and provides a signal once a pre-set number of detachments have been performed."  This limitation is obvious over the combination of prior art discussed above, in further view of *Scheldrup*.

*Scheldrup* discloses an apparatus and method for detection of embolic device detachment, which includes a circuit capable of monitoring a number of detachments performed and providing a signal once a pre-set number of detachments have been performed.  Figure 1 of *Scheldrup* is reproduced below.

Exhibit 1
-55-

1
2
3
4
5
6
7
8
9
10
11
12
13
14



FIG.  1

15    *Scheldrup*, Fig. 1.

16    As shown in Figure 1, *Scheldrup* discloses an "embolic device detection

17    circuit," referred to as an "EDDC," which "includes an alternating current (AC)

18    impedance monitoring circuit and may also include a microprocessor 300 …."

19    *Scheldrup*, 4:59-65.   *Scheldrup* further discloses automatic calibration of the

20    EDDC wherein the central processing unit is capable of running diagnostic test,

21    such as a "program integrity Erasable Programmable Read Only Memory

22    (EPROM) test. *Id.* at 16:14-21.  The EPROM test enables the device to compare

23    programmed values against use values, such as elapsed time or detachment

24    cycles, to display messages to the user upon device startup.   *Id.* at 16:34-41,

25    17:52-56.

26    A skilled artisan would have been motivated to combine the references

27    discussed above with *Scheldrup* because *Scheldrup* is specifically directed to

28    microcoil delivery systems that utilize electrically activated release mechanisms.

Exhibit 1
-56-

Moreover, a skilled artisan would have been motivated to incorporate the monitoring features of *Scheldrup* into *Wilson's* delivery device to provide the user with a feedback mechanism to monitor usage of the device, with an expectation of success. Finally, the modification of *Wilson* to use the features disclosed in *Scheldrup* would merely require the combination of one known element (i.e. *Scheldrup's* EPROM and related circuit) with another known element (i.e. *Wilson's* electrical control unit) to obtain a predictable result (i.e. monitoring usage of the device).

Thus, the proposed combination renders all of the Asserted Claims of the '819 Patent obvious.

**D.    Invalidity of the '338 Patent Under 35 U.S.C. §§ 102 & 103**

The Asserted Claims of the '338 Patent, as properly construed and/or if construed to cover Balt's accused Optima Coil System, are invalid at least because they are anticipated under 35 U.S.C. § 102 and/or obvious under 35 U.S.C. § 103 by the prior art. In addition to the invalidity arguments described below, exemplary claim charts for the '338 Patent are attached hereto as Appendix D & E.

**1.    The Asserted Claims Are Invalid Under 35 U.S.C. § 102**

All of the Asserted Claims of the '338 Patent are anticipated under 35 U.S.C. § 102 by Fitz, as demonstrated in the claim chart attached as Appendix D to these contentions.

**2.    The Asserted Claims Are Invalid Under 35 U.S.C. § 103**

Balt sets forth below specific combinations of prior art that render the Asserted Claims of the '338 Patent obvious. These prior art combinations are not exhaustive. Rather, they are illustrative examples of prior art combinations using the prior art disclosed generally above. To the extent MVI contends that any of the cited prior art fails to disclose one or more limitations of the Asserted Claims, Balt reserves the right to identify other prior art references that, when combined

Exhibit 1
-57-

with the other prior art, would render the claims obvious despite the allegedly missing limitation.  In addition to the invalidity arguments described below, exemplary claim charts for the '338 Patent are attached hereto as Appendix E.

### a.    *Fitz* alone, in view of the knowledge of a person of ordinary skill in the art

As discussed above and demonstrated in the claim chart attached as Appendix D, *Fitz* anticipates each of the Asserted Claims of the '338 Patent under 35 U.S.C. § 102.  However, to the extent it is determined that *Fitz* does not anticipate one or more of the Asserted Claims, the Asserted Claims would have been obvious under 35 U.S.C. § 103 over *Fitz* alone, in view of the knowledge of a skilled artisan as of the earliest alleged priority date of the '338 Patent.

### b.    *Fitz*, in combination with one or more of *Ken* and/or *Simon*

To the extent it is determined that *Fitz* neither anticipates one or more of the Asserted Claims, nor renders one or more of the Asserted Claims obvious in view of the knowledge of a skilled artisan, the asserted claims of the '338 Patent nonetheless would have been obvious under 35 U.S.C. § 103 over *Fitz* in combination with one or more of *Ken* and/or *Simon*, in view of the knowledge of a skilled artisan as of the earliest alleged priority date of the '338 Patent.

*Fitz* is the published patent application that later issued as the '506 Patent. Accordingly, *Fitz* discloses limitations of the claims of the '506 Patent.  Likewise, because the '506 Patent and the '819 Patent share a common specification, *Fitz* also discloses limitations of the claims of the '819 Patent.  Many of the limitations recited in the Asserted Claims of the '338 Patent are common to the Asserted Claims of the '506 Patent and/or the '819 Patent.  For example, claim 1 of the '338 Patent recites a delivery device having a heater coil, a helical microcoil, and a stretch-resistant filament connecting the delivery device to the microcoil.  As shown in Figure 4 below, *Fitz* discloses these limitations.

Exhibit 1
-58-

*Fitz*, Fig. 4.  Similarly, the combinations of prior art discussed above with respect to the '506 Patent and the '819 Patent apply equally to the limitations of the '338 Patent.



FIG. 4

The '338 Patent differs from the '506 Patent and the '819 Patent in that it also recites a specific structure associated with the stretch-resistant member.  To the extent *Fitz* is determined to not disclose these structures, they are nonetheless obvious over *Fitz* (or the combination of *Wilson*, *Gandhi I*, *Cox*, *Taki*, *Ogawa*, *Kester*, and the *Micrus Stretch-Resistant Microcoil System*, discussed below), in view of *Ken* and/or *Simon*.

*Ken* discloses a stretch-resistant member characterized by a single monofilament (134/136) that connects the implant (130) to the delivery device, as shown in Figure 3A below.



Fig.  3A

*Ken*, Fig. 3A.

*Simon* discloses a comparable structure in Figure 6 (shown below), which depicts "an anchor link … combined with a vaso-occlusive core element so as to inhibit unwanted stretching of the vaso-occlusive core element."  *Simon*, ¶ [0042].

/ / /

/ / /

/ / /



*Simon*, Fig. 6.

Both *Ken* and *Simon* further disclose a stretch-resistant member passing through the lumen of the microcoil and attached at multiple locations along the length of the microcoil. These connection points isolate the portion of the stretch-resistant member within the lumen of the microcoil from the tension of a proximal portion of the stretch-resistant member attached to the delivery device. *See, e.g.*, *Ken*, 1:20-23 ("Central to the invention is the use of a stretch-resisting member extending through the lumen formed, which stretch-resisting member is fixedly attached, directly or indirectly, to the coil in at least two locations"), 3:9-17 ("The stretch-resisting member is preferably loose within the coil to prevent binding of the coil during passage of the coil through turns in the vasculature"). *See Simon*, Fig. 6.

*Ken* and *Simon* also disclose the stretch-resistant member is connected to the distal end of the microcoil with a knot or adhesive. *See Ken*, Figs. 2A-2B; *Simon*, ¶ [0036].



It would have been obvious to a skilled artisan to combine the teachings of *Fitz* with *Ken* and/or *Simon* to create a device that included multiple points of fixed contact between the stretch-resistant tether, implant and delivery pusher

Exhibit 1
-60-

with an expectation of success.  First, because all of the references are directed to detachable implant systems, a skilled artisan would have been aware of their respective teachings.  Second, a skilled artisan would have been motivated to tension the portion of the tether adjacent to the detachment mechanism for all of the reasons discussed above with respect to the '506 Patent and the '819 Patent, with an expectation of success.  Moreover, in view of *Ken's* teaching regarding the desirability of maintaining some slack on the tether within the lumen of the microcoil, a skilled artisan would be motivated to isolate that portion of the tether from the tensioned portion with an expectation of success.  This would ensure that the device retained the benefits of a tensioned detachment zone (i.e. reduced detachment time) without sacrificing the navigation or maneuverability of the stretch-resistant microcoil implant within the vasculature.  Accordingly, the Asserted Claims of the '338 Patent would have been obvious.

### c.    *Wilson* in combination with one or more of *Gandhi I*, *Kester*, *Cox*, *Taki*, *Ogawa*, the *Micrus Stretch-Resistant MicroCoil System* and/or *Ken* and/or *Simon*

To the extent it is determined that neither *Fitz* nor the combination of *Fitz* with *Ken* and/or *Simon* disclose these structures or renders them obvious, they are nonetheless obvious over the combination of *Wilson, Gandhi I*, *Cox*, *Taki*, *Ogawa*, *Kester*, and/or the *Micrus Stretch-Resistant Microcoil System*, in further view of *Ken* and/or *Simon*.

As noted above, the '338 Patent differs from the '506 Patent and the '819 Patent in that it also recites a specific structure associated with the stretch-resistant member.  Accordingly, the limitations of the Asserted Claims of the '338 Patent that overlap with those of the '506 Patent and/or '819 Patent are obvious over *Wilson*, in view of one or more of *Gandhi I*, *Cox*, *Taki*, *Ogawa*, *Kester*, and/or the *Micrus Stretch-Resistant Microcoil System,* as discussed above in connection with the '506 Patent and the '819 Patent, and those sections are fully incorporated

Exhibit 1
-61-

herein by reference. *See* Section VI. B, *supra* ('506 Patent); Section VI.C, *supra* ('819 Patent).

In addition to the disclosures of one or more of *Gandhi I*, *Cox*, *Taki*, *Ogawa*, *Kester*, and/or the *Micrus Stretch-Resistant Microcoil System, Ken* discloses a stretch-resistant member characterized by a single monofilament (134/136) that connects the implant (130) to the delivery device, as shown in Figure 3A below.



Fig. 3A

*Wilson* also discloses a structure as shown in Figure 4 below.



FIG. 4

In addition to the disclosures of one or more of *Gandhi I*, *Cox*, *Taki*, *Ogawa*, *Kester*, and/or the *Micrus Stretch-Resistant Microcoil System, Simon* discloses a comparable structure in Figure 6 (shown below), which depicts "an anchor link … combined with a vaso-occlusive core element so as to inhibit unwanted stretching of the vaso-occlusive core element." *Simon*, ¶ [0042].

/ / /

/ / /

/ / /

/ / /



FIG. 6

In addition to the disclosures of one or more of *Gandhi I*, *Cox*, *Taki*, *Ogawa*, *Kester*, and/or the *Micrus Stretch-Resistant Microcoil System,* both *Ken* and *Simon* further disclose a stretch-resistant member passing through the lumen of the microcoil and attached at multiple locations along the length of the microcoil. These connection points isolate the portion of the stretch-resistant member within the lumen of the microcoil from the tension of a proximal portion of the stretch-resistant member attached to the delivery device. *See, e.g.*, *Ken*, 1:20-23 ("Central to the invention is the use of a stretch-resisting member extending through the lumen formed, which stretch-resisting member is fixedly attached, directly or indirectly, to the coil in at least two locations"), 3:9-17 ("The stretch-resisting member is preferably loose within the coil to prevent binding of the coil during passage of the coil through turns in the vasculature"). *See Simon*, Fig. 6.

*Ken* also discloses the stretch-resistant member is connected to the distal end of the microcoil with a knot or adhesive, as shown in Figures 2A-B below.



Fig. 2A    Fig. 2B

Exhibit 1
-63-

*Simon* also discloses the stretch-resistant member is attached to the microcoil at a first location by tying with a knot or adhesive bonding. *Simon*, ¶ [0036].

It would have been obvious to a skilled artisan to combine the teachings of *Wilson* with *Ken* and/or *Simon* to create a device that included multiple points of fixed contact between *Wilson's* the stretch-resistant tether, implant and delivery pusher with an expectation of success. First, because all of the references are directed to detachable implant systems, a skilled artisan would have been aware of their respective teachings. Second, a skilled artisan would have been motivated to tension the portion of *Wilson's* tether adjacent to the detachment mechanism for all of the reasons discussed above with respect to the '506 Patent and the '819 Patent.

Moreover, in view of *Ken's* teaching regarding the desirability of maintaining some slack on the tether within the lumen of the microcoil, a skilled artisan would be motivated to isolate the portion of *Wilson's* tether within the lumen of the implant from the tensioned portion adjacent to the heater. This would ensure that the device retained the benefits of a tensioned detachment zone (i.e. reduced detachment time) without sacrificing the navigation or maneuverability of the stretch-resistant microcoil implant within the vasculature. Accordingly, the Asserted Claims of the '338 Patent would have been obvious.

**E.    Invalidity under 35 U.S.C. § 112**

Balt's contentions that the following claims are invalid under 35 U.S.C. § 112 are made in the alternative and do not constitute, and should not be interpreted as, admissions regarding the construction or scope of the claims of the Asserted Patents or that any of the claims of the Asserted Patents are not anticipated or rendered obvious by any prior art.

The Asserted Claims of the '506 Patent and the '819 Patent are invalid for lack of enablement and lack of written description under 35 U.S.C. §112,

Exhibit 1
-64-

paragraph 1, which requires that the specification "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."  The claims which depend from these independent claims identified below, are invalid as well, for at least the same reasons.

### 1.    Invalidity of the '506 Patent under 35 U.S.C. § 112

Claim 1 of the '506 Patent recites "wherein said implant device is released from said delivery pusher less than 1 second after activation of said electrical heating element, substantially due to said pre-tensioned state."  Claim 13 of the '506 Patent recites "said tether having been axially tensioned to lower a required detachment time and temperature for said tether to sever and break when heated," and "said tether is broken … and said implant is released … from said delivery device in less than about 1 second after activation of said heater."  Claim 23 of the '506 Patent recites "said pre-tensioned state causing said implant device to be released from said delivery pusher, along with a portion of said tether distal of said breaking point, after activation of said electrical heating element and prior to a temperature of said outer surface of said delivery pusher exceeding about 50° C."

As discussed in Sections VI.B-D above, Balt contends that each of the above-referenced limitations is disclosed by and/or obvious in view of the prior art.  To the extent MVI contends that these limitations are not disclosed by the prior art or Claims 1, 13, or 23 of the '506 Patent (or Asserted Claims 2-8, 10, 14-16, 18-20, 24-29, 31, or 33, which depend from those claims) would not be obvious to one of ordinary skill in the art, Balt contends that the '506 Patent specification does not contain sufficient written description or provide an enabling disclosure.

Exhibit 1
-65-

1     Each of the above-referenced limitations relates to a purported causal
2  relationship between the application of tension to the tether, and either the
3  resulting time required to detach the implant or the temperature of the delivery
4  device at which detachment occurs.    Rather than show that the inventors
5  possessed the claimed invention or enable a skilled artisan to make and use the
6  same without undue experimentation, however, the specification merely explains
7  the relevant knowledge of a person of ordinary skill.

8     For example, the specification states that the tensional force applied to the
9  tether "is below the elastic limit of the tether material, but sufficient to cause the
10 tether to sever quickly when heat is applied."  6:52-54. Rather than explain what
11 force is actually "sufficient" to achieve that purpose, the specification simply
12 notes that the force "depends on the tether material properties … ."  *Id.* at 6:48-
13 49.  Likewise, the specification notes that "the release of potential energy stored
14 [in a pre-tensioned tether] operates to apply additional pressure to separate the
15 implant device … away from the heater," and states that this "advantageously
16 lowers the required detachment time and temperature … ."  *Id.* at 8:5-11; *see also*
17 *id.* at 9:7-13.  But the specification fails to explain how much potential energy or
18 "additional pressure" is required to achieve the purported "advantageous" effects.

19    Though the specification generically describes how to apply tension to a
20 tether, and the process by which a tensioned tether breaks upon application of
21 heat (*see* '506 Patent, 12:21-28), it does not convey to one of ordinary skill that
22 the inventors invented a device that causes implant detachment in less than one
23 second and/or prevents the temperature of the system from exceeding 50°C at the
24 time of detachment.  At best, the specification merely discloses that which would
25 render the claims obvious.  This does not meet the written description standard
26 articulated in 35 U.S.C. § 112, first paragraph.

27    In  addition,  the  specification  does  not  enable,  without  undue
28 experimentation, a skilled artisan to make and use such a device. *See In re Wands*,

Exhibit 1
-66-

858 F.2d 731, 737 (Fed. Cir. 1988) (listing non-exhaustive factors relevant to enablement inquiry). For example, rather than direct a skilled artisan to make the device, the specification merely identifies the relevant technical considerations and leaves it to the skilled artisan to figure out how to make it work in practice. *Id.* (amount of direction provided by inventor relevant to enablement inquiry). As another example, the specification does not identify any working examples of the claimed invention. *Id.* (existence of working examples relevant to enablement inquiry). This does not meet the enablement standard articulated in 35 U.S.C. § 112, first paragraph. Accordingly, Asserted Claims 1, 13, and 23 of the '506 Patent (and Asserted Claims 2-8, 10, 14-16, 18-20, 24-29, 31, and 33, which depend from these claims), are invalid under 35 U.S.C. § 112, first paragraph for lack of enablement.

Separate and apart from the limitations discussed above, dependent claims 2, 16, and 24 are also invalid for lack of enablement under 35 U.S.C. § 112, first paragraph. Claims 2 and 16 recite "wherein the pre-tension within said tether is less than about 250 grams," and Claim 24 recites "wherein the pre-tension in said tether is less than about 200 grams." Rather than provide a skilled artisan with any direction about how to make the claimed device, the specification merely states: "If potential energy is stored within the detachment system **100, 200,** or **300,** the force used to separate the implant device **112, 302** typically ranges up to 250 grams." '506 Patent, 9:33-35. But, at a minimum, this disclosure is ambiguous as to the relationship between tension in the tether and the "force used to separate the implant device." Moreover, the claim states "up to 250 grams," meaning that the force could be zero. But a zero force suggests that the claim covers an implant that would simply fall off the end of the device. Regardless, because the specification does not describe any working examples of the purported invention, a skilled artisan is left to wonder how to make such a device.

Exhibit 1
-67-

This does not satisfy the enablement requirement of 35 U.S.C. § 112, first paragraph.

### 2. Invalidity of the '819 Patent under 35 U.S.C. § 112

Claims 1, 7, 13, and 15 of the '819 Patent recites "wherein tension in the tether increases the rate at which the tether is broken." The '819 Patent is a continuation of the '506 Patent, and thus shares a common specification with the '506 Patent. Accordingly, for all the same reasons as those discussed above with respect to the '506 Patent, to the extent MVI contends that these limitations are not disclosed by the prior art or Claims 1, 7, 13, or 15 of the '819 Patent (or Asserted Claims 5, 10-12, 15, 17, or 18, which depend from these claims) would not be obvious to one of ordinary skill in the art, Balt contends that the '819 Patent specification does not contain sufficient written description or provide an enabling disclosure for at least the same reasons as discussed above regarding the '506 patent. *See* Section VI.E.1, *supra*. Thus, these claims are invalid for lack of enablement and lack of written description under 35 U.S.C. § 112, first paragraph.



Exhibit 1
-68-



## VIII.  <u>CLAIM CHARTS</u>

Balt is providing herewith claim charts (Appendix A – Appendix E) describing, with respect to the prior art, some of Balt's initial contentions that the asserted claims are invalid. The claim charts provided are representative of the references and disclosure herein and are not intended as exhaustive. Persons of ordinary skill in the art at the time of filing the applications for the Patents-in-suit knew to read references as a whole, and in the context of other publications, literature and the general knowledge in the field. Balt may rely on all such information as well as other portions of the prior art references cited in these Initial Invalidity Contentions, other references and documents, and expert testimony, to establish that a limitation is inherent; to establish enablement of a prior art reference; to provide context and as aids to understanding and interpreting the listed references; and/or to establish that it would have been obvious for a person of ordinary skill in the art to modify or combine any of the cited references.

## IX.  <u>DOCUMENT PRODUCTION</u>

In accordance with P.R. 3.4, Balt is producing herewith documents bearing bates numbers BALT0000001 - BALT0004222, which includes: (a) technical documents sufficient to show the operation of any aspects of elements of an

Accused Instrumentality identified by MVI; and (b) copies of all prior art identified herein.  Balt reserves the right to identify and produce additional documents.

At this time, Balt is not aware of any agreements that are comparable to a license that would result from a hypothetical reasonable royalty negotiation or any other agreements that Balt may use to support its denial of infringement damages in this case.  Balt reserves its right to supplement its document production to include any such agreements, to the extent they are identified through further discovery or investigation.  Balt also notes that Balt has provided information sufficient to show the sales of Accused Instrumentalities in response to MVI's interrogatories in this case.  To the extent MVI requires further information to evaluate its alleged damages, Balt remains willing to meet and confer to discuss the production of additional relevant documents or information, as necessary to the needs of the case.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 20, 2019    By: _/s/ William O. Adams_
                                                        Sheila N. Swaroop
                                                        William O. Adams
                                                        Nicholas A. Belair
                                                        Alexander D. Zeng

Attorneys for Defendant/Counterclaimant,
Balt USA, LLC

Exhibit 1
-70-

**PROOF OF SERVICE**

I am a citizen of the United States of America and I am employed in Irvine, California. I am over the age of 18 and not a party to the within action. My business address is 2040 Main Street, Fourteenth Floor, Irvine, California.

On December 20, 2019, I served the within **DEFENDANT BALT USA, LLC'S PRELIMINARY INVALIDITY DISCLOSURES** on the parties or their counsel shown below, by transmitting it electronically to the address as follows:

EVAN FINKEL
MICHAEL S. HORIKAWA
CHAZ M. HALES
PILLSBURY    WINTHROP    SHAW
PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Tel.: (213) 488-7100
Fax: (213) 226-4058
Email: evan.finkel@pillsburylaw.com
michael.horikawa@pillsburylaw.com
chaz.hales@pillsburylaw.com

Callie A. Bjurstrom
PILLSBURY    WINTHROP    SHAW
PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101-3575
Tel.: (619) 544-3107
Fax: (619) 819-4363
Email:
callie.bjurstrom@pillsburylaw.com

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 20, 2019 at Irvine, California.

_____
Peter Toller

Exhibit 1
-71-

# EXHIBIT 3

CONFIDENTIAL

EVAN FINKEL (100673)
evan.finkel@pillsburylaw.com
MICHAEL S. HORIKAWA (267014)
michael.horikawa@pillsburylaw.com
CHAZ M. HALES (324321)
chaz.hales@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Tel: 213.488.7307
Fax: 213.226.4058

CALLIE A. BJURSTROM (137816)
callie.bjurstrom@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101-3575
Tel: 619.544.3107
Fax: 619.236.1995

**Attorneys for Plaintiff
MICROVENTION, INC**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MICROVENTION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BALT USA, LLC,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS | Case No. 8:19-cv-01335-JLS-KES<br><br>**PLAINTIFF MICROVENTION, INC.'S PRELIMINARY DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS PURSUANT TO N.D. CAL. LOCAL PATENT RULES 3-1 AND 3-2**<br><br>**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER (DKT. 27, OCT. 30, 2019)** |

Exhibit 3
-152-

CONFIDENTIAL

1    Dated:  November 15, 2019

2                                    EVAN FINKEL
                                     CALLIE A. BJURSTROM
3                                    MICHAEL S. HORIKAWA
                                     CHAZ M. HALES
4                                    **PILLSBURY WINTHROP SHAW
                                     PITTMAN LLP**
5
                                     By:_____/s/ Evan Finkel_____
6                                           Evan Finkel
                                            Attorneys for Plaintiff
7                                           MICROVENTION, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-19-

Exhibit 3
-153-

CONFIDENTIAL

### Appendix B – Infringement Contentions for U.S. Patent No. 9,414,819

In these Infringement Contentions, MicroVention, Inc. ("MVI") contends that at least the following claims of U.S. Patent No. 9,414,819 ("the '819 Patent") are infringed by Balt USA, LLC's ("Balt") Optima Coil System, with or without the XCEL Detachment Controller (collectively, the "Accused Products"), as detailed below. Specifically, Balt infringes at least claims 1, 5, 7, 10–13, 15, and 17–18 of the '819 Patent under 35 U.S.C. §§ 271(a), 271(b), and 271(c). MVI does not concede that any claims of the '819 Patent omitted from the list below are not infringed by the Accused Products. Moreover, the citation to certain documents and/or information below is intended to be exemplary only and in no way forecloses MVI from citing to or relying on additional documents, information, source code, and/or testimony at a later time. These contentions are preliminary in nature and an analysis of the Accused Products, Balt's internal documentation, source code, and/or testimony from relevant witnesses may more fully and accurately describe the infringing features of the Accused Products. Accordingly, MVI reserves the right to supplement, correct, modify, and/or amend these contentions as discovery in this case progresses and once such additional information is made available to MVI. Furthermore, MVI reserves the right to supplement, correct, modify, and/or amend these contentions in view of the Court's claim construction order(s); in view of any positions taken by Balt, including, but not limited to, positions on claim construction, invalidity, and/or non-infringement; and in connection with the preparation and exchange of expert reports. Upon information and belief, the Complex 10 Super Soft configuration and model (i.e., Model No. OPTI051CSS10) of the Optima Coil System cited below in these contentions is representative of the Accused Products, including all of the various implant configurations and softness profiles available as part of the Optima Coil System.

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 U.S.C. § 271(a) | X | | | | X | | X | | | X | X | X | X | | X | | X | X | | |
| 35 U.S.C. § 271(b) | X | | | | X | | X | | | X | X | X | X | | X | | X | X | | |
| 35 U.S.C. § 271(c) | X | | | | X | | X | | | X | X | X | X | | X | | X | X | | |

Exhibit 3
-154-

| Claims of the '819 Patent | Balt Optima Coil System |
|---|---|
| 1. An implant device delivery system comprising: | Balt's Optima Coil System, with or without the XCEL Detachment Controller, is an "implant device delivery system," as described in the preamble. *See* Answer, ¶ 68 ("Balt admits the Optima Coil System is an implant delivery system."). To the extent the preamble is limiting, the Optima Coil System meets the preamble.<br><br><br><br>**Figure 1 – The Optima Coil System consists of an implant connected to a delivery pusher and a detachment controller used to activate an electrical heater that is part of the pusher.** *See* **Complaint, ¶ 30 (Fig. A). [Source: https://balt-usa.com/products/optima-coil-system/]** |

2

Exhibit 3
-155-

CONFIDENTIAL

| a delivery pusher having a proximal end and a distal end; | The Optima Coil System includes an "optimal pusher," depicted in Figure 1 above and seen in Figure 2 below, that is comprised of a "stainless steel hypotube" section and a "body coil" section with a "detachment zone," and that meets the "delivery pusher" limitation. The Optima Coil pusher has a proximal end near the user (labeled as "B" in Figure 2 below), typically a surgeon or interventional neuroradiologist, for connection to an XCEL Detachment Controller and a distal end where the implant is attached (labeled as "A" in Figure 2 below). *See* Figure 1 above; Answer, ¶ 35 ("Balt admits that the Optima Coil System includes a pusher, which is used to navigate the Optima Coil implant to the implant site and position the implant within the treatment site."); Answer, ¶ 69 ("Balt admits the Optima Coil System includes a pusher that has a proximal end for connection to an XCEL Detachment Controller and a distal end where the implant can be attached."); Optima Coil System Instructions For Use, Ex. A to Complaint ("IFU"), p. 8 (including cover page) ("Continue to advance the Optima Coil into the lesion until optimal deployment and desired placement is achieved."). Thus, the pusher of Optima Coil System meets the "delivery pusher having a proximal end and a distal end" limitation.<br><br><br><br>**Figure 2 – The Optima Coil System removed from its packaging hoop. The embolic coil implant can be seen at the distal end of the pusher (A), and the segment for connection to the XCEL Detachment Controller can be seen at the proximal end (B).** *See* **Appendix to Complaint, p. 8 (including cover page) (Fig. 7).** |

3

Exhibit 3
-156-

CONFIDENTIAL

| | |
|---|---|
| an electrically activated implant release member; | The Optima Coil System includes a resistive heater coil, shown in Figure 3 below, that meets the "electrically activated implant release member" limitation. *See* Answer, ¶ 39 ("Balt admits the Optima Coil pusher contains a resistive heater coil."). The resistive heater coil located at the distal end of the pusher is powered by direct current from the XCEL Detachment Controller and thus is "electrically activated." *See* Answer, ¶ 70 ("Balt admits the Optima Coil System includes a resistive heater coil located at the distal end of the pusher and that is powered by the XCEL Detachment Controller."). Details of the XCEL Detachment Controller are shown in Figure 4 through Figure 7 below. Further, the purpose of the heater coil is to release the implant (e.g., an embolic coil) from the pusher upon activation by heating the tether that passes through the lumen of the heater coil such that the tether is severed and the implant is released. *See* IFU, p. 3 (including cover page) ("The Optima Coil achieves detachment by an internal heater element, which is powered by the XCEL Detachment Controller."). Thus, the Optima Coil System meets the "electrically activated implant release member" limitation. |



**Figure 3 – The electric heater coil is visible at the distal end of the delivery pusher. The monofilament tether can be seen passing through the lumen of the heater coil loops (C). Also, the points at which the green (A) and yellow (B) wires are soldered to the heater are visible.** *See* **Appendix to Complaint, p. 13 (including cover page) (Fig. 12).**

Exhibit 3
-157-

CONFIDENTIAL



**Figure 4 – Top and bottom views of the XCEL Detachment Controller.** *See* **Appendix to Complaint, p. 22 (including cover page) (Fig. 21).**



**Figure 5 – The funnel shape at the front end of the XCEL Detachment controller facilitates insertion of the proximal end of the delivery pusher.** *See* **Appendix to Complaint, p. 23 (including cover page) (Fig. 22).**

Exhibit 3
-158-



**Figure 6 – A view of the XCEL Detachment Controller with its cover removed shows the batteries used as the power source.** *See* **Appendix to Complaint, p. 24 (including cover page) (Fig. 23).**



**Figure 7 – With the white funnel removed from the XCEL Detachment Controller, three contacts on the circuit board designed to connect to the electrical contacts on the proximal end of the delivery pusher can be seen.** *See* **Appendix to Complaint, p. 25 (including cover page) (Fig. 24).**

6

Exhibit 3
-159-

CONFIDENTIAL

| a pre-tensioned tether associated with the implant release member such that said tether is broken by the implant release member when energized; | The Optima Coil System is provided to the user, such as a surgeon or interventional neuroradiologist, pre-assembled with the implant attached to the pusher by a tether that is in a pre-tensioned state. *See* Answer, ¶ 40 ("Balt admits the segment of the thread that connects the Optima Coil implant to the pusher can be under tension at some point during use."). The Optima Coil System includes an Engage brand polyolefin elastomeric tether that connects the implant to the pusher. *See* Answer, ¶ 37 ("Balt admits the Optima Coil implant can be secured to the distal end of the pusher by a thread made from Polyolefin Engage."). As seen in Figure 8 below, the tension in the polyolefin elastomeric tether of the Optima Coil System was measured to determine the amount of pre-tension that is placed on the tether during assembly of the Optima Coil System. As shown below, the tether is pre-tensioned with approximately 8.66 grams-force (gF) of tension and is, therefore, "pre-tensioned." As seen in Figure 8 and Figure 9, the tether is associated with the implant release member because the tether passes through the lumen of the heater coil, and when the heater is energized, the tether is broken. *See* Answer, ¶ 71 ("Balt admits the Optima Coil System includes a thread made from Polyolefin Engage that can connect the implant to the pusher."). Thus, the Optima Coil System meets the "pre-tensioned tether associated with the implant release member such that said tether is broken by the implant release member when energized" limitation. |
| --- | --- |



**Figure 8 – Prior to detachment, the tension in the Optima Coil System tether is 8.66 grams-force (gF) (left). Post-detachment, the now distal end of the tether severed by the heater rebounds into the delivery pusher approximately 0.09 inches, indicating that the tether had been under tension prior to detachment.** *See* **Appendix to Complaint, p. 26 (including cover page) (Fig. 25).**

7

Exhibit 3
-160-

CONFIDENTIAL



**Figure 9 – Close-up of the proximal end of the implant connected to the distal end of the delivery pusher. The monofilament tether connecting the implant to the delivery pusher is visible in the lumen of the pusher, including the lumen of the electrical heater.** *See* **Appendix to Complaint, p. 11 (including cover page) (Fig. 10).**

| | |
|---|---|
| a conductive core member having an externally exposed portion at said | The pusher of the Optima Coil System has a proximal end that is inserted into the XCEL Detachment Controller (i.e., a power source), as seen in Figure 5 above. *See* Answer, ¶ 44 ("Balt admits the proximal end of the pusher is designed for electrical connection to the XCEL Detachment Controller."); Answer, ¶ 46 ("Balt admits that Paragraph 46 generally describes the process by which |

Exhibit 3
-161-

CONFIDENTIAL

| proximal end for connection to a power source; | a surgeon may insert the proximal end of the pusher into the XCEL Detachment Controller."); Answer, ¶ 72 ("Balt admits the Optima Coil System has a proximal end that may be inserted into an XCEL Detachment Controller and can connect to an XCEL Detachment Controller."). The hypotube section at the proximal end of the pusher is conductive and meets the "conductive core member" limitation. The exposed portion of the hypotube at the proximal end of the pusher, identified in Figure 10 as "A", forms one connection point for the power source of the XCEL Detachment Controller and meets the "externally exposed portion" limitation. Details of the XCEL Detachment Controller are shown in Figure 4 through Figure 7 above. As shown in Figure 3 above, Figure 11 and Figure 12, the yellow wire attaches to the heater coil near the distal end of the pusher, passes through the lumen of the pusher, and exits the pusher at its proximal end, where it attaches to the hypotube section of the pusher. *See* Answer, ¶ 43 ("Balt admits the green wire and yellow wire are attached at the distal and proximal ends of the heater coil, respectively."); Answer, ¶ 44 ("Balt admits that Figure 18 of the Appendix [reproduced in this chart as Figure 10] purports to show the electrical connector at the proximal end of the pusher. Balt admits that Figure 20 of the Appendix [reproduced in this chart as Figure 12] purports to show the connection point formed where the yellow wire exits the pusher and is soldered to the pusher."). Thus, the segment of the hypotube that connects to the XCEL Detachment Controller is electrically connected to the heater coil and a power source. *Id.*; *see also* IFU, p. 9 (including cover page) ("[G]ently slide the funnel of the XCEL Detachment Controller over the proximal end of the Optima Coil delivery pusher. . . . Once the proximal tip of the delivery pusher bumps against the inside of the XCEL Detachment Controller and the delivery pusher and internal contacts of the controller are properly connected, a short single audible sound will be heard and a steady green light will be visible. This confirms that a proper connection of the XCEL Detachment Controller to the Optima Coil delivery pusher has been established."). Thus, the Optima Coil System meets "conductive core member having an externally exposed portion at said proximal end for connection to a power source" limitation. |

9

Exhibit 3
-162-

CONFIDENTIAL



**Figure 10 – The proximal end of the Optima Coil System delivery pusher is configured for electrical connection with the XCEL Detachment Controller. The exposed segment of the hypotube section of the delivery pusher (A) and gold layer (B) provide contact points for connection to the XCEL Detachment Controller. The hypotube and gold layer are electrically isolated from one another by an insulating layer.** *See* **Appendix to Complaint, p. 19 (including cover page) (Fig. 18).**

Exhibit 3
-163-

CONFIDENTIAL



**Figure 11 – Close-up of the site near the distal end of the delivery pusher where the tether attaches (A). The green and yellow wires can also be seen passing through the lumen of the pusher.** *See* **Appendix to Complaint, p. 17 (including cover page) (Fig. 16).**

11

Exhibit 3
-164-

CONFIDENTIAL



**Figure 12 – Close-up of the proximal end of the Optima Coil System delivery pusher shows where the yellow wire exits the lumen of the pusher and is connected to the proximal tip of the pusher itself (B), forming an electrical connection between the hypotube section of the pusher and the heater coil. An insulating layer that separates the inner pusher hypotube from the outer gold conducting layer is also visible (A).** *See* **Appendix to Complaint, p. 21 (including cover page) (Fig. 20).**

12

Exhibit 3
-165-

CONFIDENTIAL

| | |
|---|---|
| an insulating layer disposed on at least a portion of said conductive core member near said proximal end; and, | The proximal end of the hypotube section of the pusher that meets the "conductive core member" limitation is electrically isolated from the conductive gold layer on the exterior of the pusher (labeled as "B" in Figure 10) by an insulating layer disposed on the conductive core member, as seen in Figure 10, Figure 12, and Figure 13. *See* Answer, ¶ 73 ("Balt admits that the proximal end of the pusher includes a yellow wire that can be electrically isolated from a gold layer on the exterior of the pusher by an insulating layer."). Thus, the Optima Coil System meets the "insulating layer disposed on at least a portion of said conductive core member near said proximal end" limitation.<br><br><br><br>**Figure 13 – A close-up of the distal end of the gold conducting layer shows where the green wire (A) emerges from the lumen of the pusher and forms an electrical connection with the gold conducting layer. The insulating layer (B) that isolates the gold conducting layer from the conductive core of the pusher itself is also visible.** *See* **Appendix to Complaint, p. 20 (including cover page) (Fig. 19).** |

Exhibit 3
-166-

CONFIDENTIAL

| | |
|---|---|
| a conductive layer disposed on at least a portion of said insulating layer, and having an externally exposed surface for connection to the power source; | As seen in Figure 3, Figure 11, and Figure 13, the green wire that is connected to the resistive heater coil at the distal end of the pusher runs through the lumen of the pusher and exits the pusher through a small hole near the proximal end of the pusher, adjacent to which it is attached to the externally exposed gold surface layer (conductive layer) on the proximal end of the pusher. *See* Answer, ¶ 45 ("Balt admits the green wire runs the length of the pusher and is soldered near the proximal end of the pusher. . . . Balt admits that Figure 19 of the Appendix purports to show a close-up of the connection formed by the green wire and the gold conductive layer."). This conductive gold layer on the proximal end of the pusher has an externally exposed surface that forms an electrical connection with the XCEL Detachment Controller (power source) when the pusher is inserted into the XCEL Detachment Controller. *See* Answer, ¶ 74 ("Balt admits that Paragraph 74 purports to describe the device pictured in Figures 12, 16, 19 and 21-24 of the Appendix. . . . Balt admits that the proximal section of the pusher can form an electrical connection with the XCEL Detachment Controller."); IFU, p. 9 (including cover page) ("[T]he gold connector on the proximal end of the Optima Coil delivery pusher. . . . [K]eeping the gold connector free of [blood and contrast] is important for the proper functionality of the XCEL Detachment Controller."). Details of the XCEL Detachment Controller are shown in Figure 4 through Figure 7 above. Furthermore, the conductive gold layer is disposed on the insulating layer that is disposed on the conductive core member, as seen in Figure 10, Figure 12, and Figure 13. *See* Answer, ¶ 73 ("Balt admits that the proximal end of the pusher includes a yellow wire that can be electrically isolated from a gold layer on the exterior of the pusher by an insulating layer."). Thus, the Optima Coil System meets the "conductive layer disposed on at least a portion of said insulating layer, and having an externally exposed surface for connection to the power source" limitation. |
| wherein said conductive layer and said conductive core conduct an electrical current from said proximal end of said delivery pusher to said electrically activated implant release member; | The exposed portion of the pusher hypotube near the proximal end of the pusher (conductive core member), which is connected to the yellow wire, and the gold conductive layer also at the proximal end of the pusher (conductive layer), which is connected to the green wire, together form an electrical circuit that runs through the heater coil (electrically activated implant release member) at the distal end of the pusher. *See* Answer, ¶ 75 ("Balt admits that the yellow and green wires are connected near the proximal end of the pusher and form an electrical circuit with the XCEL Detachment Controller that is capable of conducting direct electrical current to the heater coil at the distal end of the pusher."). When the proximal end of the pusher is inserted into the XCEL Detachment Controller, the circuit is capable of conducting electrical current from the XCEL Detachment Controller to the heater coil. *See id.*, IFU, p. 9 (including cover page) ("43. Once the |

14

Exhibit 3
-167-

CONFIDENTIAL

| | proximal tip of the delivery pusher bumps against the inside of the XCEL Detachment Controller and the delivery pusher and internal contacts of the controller are properly connected, a short single audible sound will be heard and a steady green light will be visible. This confirms that a proper connection of the XCEL Detachment Controller to the Optima Coil delivery pusher has been established."). Thus, the Optima Coil System meets the "wherein said conductive layer and said conductive core conduct an electrical current from said proximal end of said delivery pusher to said electrically activated implant release member" limitation. |
|---|---|
| wherein tension in the tether increases the rate at which the tether is broken once a circuit is closed between said externally exposed portion of said conductive core member and said externally exposed surface of said conductive layer. | When the user, typically a surgeon or interventional neuroradiologist, presses the button on the XCEL Detachment Controller, the circuit between the exposed section of the hypotube at the proximal end of the pusher (conductive core member), which is connected to the yellow wire, and the conductive gold layer (conductive layer), which is connected to the green wire, is closed and the heater is activated by direct current. *See* Figure 14; Answer, ¶ 76 ("Balt admits that when the proximal end of the pusher is inserted into the XCEL Detachment Controller, depressing the button on the XCEL Detachment Controller can close a circuit that conducts direct current to the heater coil at the distal end of the pusher."). As seen in Figure 14, Balt advertises on its website and marketing materials that the Optima Coil System, with its pre-tensioned tether, has "<1 second detachment time." As shown in Figure 8, the tether is tensioned with approximately 8.66 grams-force (gF) in order to increase the rate at which the tether is broken once a circuit is closed. Thus, the Optima Coil System meets the "wherein tension in the tether increases the rate at which the tether is broken once a circuit is closed between said externally exposed portion of said conductive core member and said externally exposed surface of said conductive layer" limitation.



**Figure 14 – A screenshot from Balt's website, on which it advertises that the Optima Coil System, including the XCEL thermal detachment system, has a detachment time of less than 1 second. [Source: https://balt-usa.com/products/optima-coil-system/]** |
| 5. The implant device delivery system of claim 1, wherein said activated | As seen in Figure 3 above, the Optima Coil System's resistive heater coil near the distal end of the delivery pusher meets the "implant release member" limitation and is a heater. *See* Answer, ¶ 39 ("Balt admits the Optima Coil pusher contains a resistive heater coil."); Answer, ¶ 70 ("Balt admits |

Exhibit 3
-168-

| | |
|---|---|
| implant release member is a heater member. | the Optima Coil System includes a resistive heater coil located at the distal end of the pusher and that is powered by the XCEL Detachment Controller."); IFU, p. 3 (including cover page) ("The Optima Coil achieves detachment by an internal heater element, which is powered by the XCEL Detachment Controller."). Thus, the Optima Coil System meets the "wherein said activated implant release member is a heater member" limitation. |
| 7. An implant device delivery system comprising: | Balt's Optima Coil System, with or without the XCEL Detachment Controller, shown in Figure 1 above, is an "implant delivery system," as described in the preamble. *See* Answer, ¶ 68 ("Balt admits the Optima Coil System is an implant delivery system."). To the extent the preamble is limiting, the Optima Coil System meets the preamble. |
| a delivery pusher having a proximal end and a distal end; | The Optima Coil System includes an "optimal pusher," depicted in Figure 1 above and seen in Figure 2 above, that meets the "delivery pusher" limitation. The pusher is long, flexible, and has a proximal end near the user, typically a surgeon or interventional neuroradiologist, for connection to an XCEL Detachment Controller and a distal end where the implant is attached. *See* Figure 1; Answer, ¶ 35 ("Balt admits that the Optima Coil System includes a pusher, which is used to navigate the Optima Coil implant to the implant site and position the implant within the treatment site."); Answer, ¶ 69 ("Balt admits the Optima Coil System includes a pusher that has a proximal end for connection to an XCEL Detachment Controller and a distal end where the implant can be attached."); IFU, p. 3 (including cover page) ("The Optima Coil System consists of an implantable embolization coil comprised of a platinum-tungsten alloy attached to a proximal stainless steel hypo-tube and distal body coil delivery pusher. . . .") Thus, the Optima Coil System meets the "delivery pusher having a proximal end and a distal end" limitation. |
| a conductive core disposed along a length of said delivery pusher; | As seen in Figure 3, Figure 11, and Figure 13, a green wire runs through the lumen of the pusher from the distal end where it attaches to the resistive heater coil to the proximal end where it exits the lumen of the pusher adjacent to the gold conductive layer. The green wire is part of the circuit that conducts electrical current from the power source in the XCEL Detachment Controller to heater coil in order detach an implant from the delivery system. The green wire meets the "conductive core" limitation and runs the length of the delivery pusher. *See* Answer, ¶ 43 ("Balt admits the green wire and yellow wire are attached at the distal and proximal ends of the heater coil, respectively."); Answer, ¶ 44 ("Balt admits the proximal end of the pusher is designed for electrical connection to the XCEL Detachment Controller."); Answer, ¶ 45 ("Balt admits the green wire runs the length of the pusher and is soldered near the proximal end of the pusher. . . . Balt admits that Figure 19 of the |

Exhibit 3
-169-

# EXHIBIT 4

Sheila N. Swaroop (SBN 203,476)
Sheila.Swaroop@knobbe.com
William O. Adams (SBN 259,001)
William.Adams@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Nicholas A. Belair (SBN 295,380)
Nicholas.Belair@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
333 Bush Street, 21st Floor
San Francisco, CA 94104
Phone: (415) 954-4111
Facsimile: (415) 954-4111

Alexander Zeng (SBN 317,234)
Alexander.Zeng@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Phone: (310) 551-3450
Facsimile: (310) 551-3458

Attorneys for Defendant,
Balt USA, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MICROVENTION, INC.,<br><br>                              Plaintiff,<br><br>          v.<br><br>BALT USA, LLC,<br><br>                              Defendant.<br><br>_____<br><br>AND RELATED COUNTERCLAIMS | Civil Action No.<br>8:19CV01335-JLS (KESx)<br><br>**DEFENDANT BALT USA, LLC'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NO. 5)** |

Exhibit 4
-170-

allowed to provide further clarification of, or support for, its infringement

disclosures, including under the doctrine of equivalents, whether through expert

testimony or otherwise.

Subject to the foregoing reservations or rights, Balt has attached exemplary

non-infringement claim charts to this supplemental response, labeled as Appendix

B ('506 Patent), Appendix C ('819 Patent), and Appendix D ('338 Patent).


Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: February 11, 2020          By:/s/ William O. Adams
                                     Sheila N. Swaroop
                                     William O. Adams
                                     Nicholas A. Belair
                                     Alexander Zeng

                                     Attorneys for
                                     Defendant/Counterclaimant,
                                     Balt USA, LLC

- 9 -

Exhibit 4
-171-

# APPENDIX B

Exhibit 4
-172-

**APPENDIX B**

**U.S. Patent No. 8,182,506 Non-Infringement Claim Chart**

| Asserted Claim | Non-Infringement Contentions |
|---|---|
| **Claim 1** | |
| An implant delivery system comprising: | |
| a. a delivery pusher; | |
| b. an implant connected to said delivery pusher; | |
| c. a tether connecting said implant to said delivery pusher, said tether having a distal end connected to said implant; | |
| d. an electrical heating element associated with said tether; | |
| e. wherein when activated, said heater causes said tether to break at a point proximal of said distal end such that a distal portion of said tether remains with said implant; and | |
| f. wherein said tether is in a pre-tensioned state below the elastic limit of the tether material and | MVI has not demonstrated that the Optima Coil System contains, either literally or under DOE, a "pre-tensioned" "tether" as construed by MVI. |
| g. wherein said implant device is released from said delivery pusher less than 1 second after activation of said electrical heating element, substantially due to said pre-tensioned state. | The Optima Coil System does not meet this claim limitation at least because the detachment time associated with the Optima Coil System implant is not "substantially due to the pre-tensioned state" of the "tether."  Further, MVI has not demonstrated that the Optima Coil System contains, either literally or under DOE, a "pre-tensioned" "tether" as construed by MVI. |
| **Claim 2** | |
| The implant delivery system of claim 1, | *See* Claim 1 |
| wherein the pre-tension within said tether is less than about 250 grams. | Further, MVI has not demonstrated that the Optima Coil System contains, either literally or under DOE, a "pre-tensioned" "tether" as construed by MVI. |

1

Exhibit 4
-173-

**APPENDIX B**

**U.S. Patent No. 8,182,506 Non-Infringement Claim Chart**

| Claim 3 | |
|---|---|
| The implant delivery system of claim 1, | *See* Claim 1 |
| wherein the pre-tension in said tether is in a direction approximately co-axial to said delivery pusher. | Further, MVI has not demonstrated that the Optima Coil System contains, either literally or under DOE, a "pre-tensioned" "tether" as construed by MVI. |
| **Claim 4** | |
| The implant delivery system of claim 1, | *See* Claim 1 |
| wherein activation of said electrical heating element releases potential energy. | The Optima Coil System does not meet this claim limitation at least because activation of the electrical heating element generates heat as a function of the resistance of the heating element material.  It does not release potential energy. |
| **Claim 5** | |
| The implant delivery system of claim 1, | *See* Claim 1 |
| wherein said tether is comprised of a material selected from a group consisting of: polypropylene, polyamide, ethylene vinyl alcohol, polyethylene, and polyolefin elastomer. | |
| **Claim 6** | |
| The implant delivery system of claim 1, | *See* Claim 1 |
| wherein the temperature of said delivery pusher is less than about 50° C. when said implant detaches from said delivery pusher. | |
| **Claim 7** | |
| The implant delivery system of claim 6, | *See* Claim 6 |
| wherein the temperature of said delivery pusher is less than about 42° C. when said implant detaches from said delivery pusher. | |

Exhibit 4
-174-

# EXHIBIT 5

| | |
|---|---|
| **From:** | Alexander.Zeng |
| **To:** | Finkel, Evan |
| **Cc:** | Pillsbury-MVI-Litigation; Lit MIBAL.001L |
| **Subject:** | Narrowing of Asserted Claims - MicroVention, Inc. v. Balt USA, LLC, 8:19-cv-01335-JLS-KES (C.D. Cal., Southern Division) |
| **Date:** | Tuesday, August 3, 2021 3:35:30 PM |

Counsel,

Now that the Court has issued its claim construction ruling and the case has progressed, we believe it would be appropriate for MVI to narrow the asserted claims. Such a narrowing would conserve both parties' resources and allow the case to proceed efficiently with expert discovery and other pre-trial deadlines.

Please let us know by August 9 whether MVI will continue to allege infringement of all of the currently asserted claims, or if there is a subset of the currently asserted claims that MVI will pursue in this matter.

To the extent MVI is unwilling to narrow its claims to a reasonable number at this stage, Balt reserves all rights.

Thank you,


**Alexander Zeng**
Associate
Alexander.Zeng@knobbe.com
310-601-1261 **Direct**
**Knobbe Martens**
1925 Century Park East, Suite 600
Los Angeles, CA 90067
www.knobbe.com/alexander-zeng

Exhibit 5
-175-

# EXHIBIT 6

| | |
|---|---|
| **From:** | Finkel, Evan |
| **To:** | Alexander.Zeng |
| **Cc:** | Pillsbury-MVI-Litigation; Lit MIBAL.001L |
| **Subject:** | RE: Narrowing of Asserted Claims - MicroVention, Inc. v. Balt USA, LLC, 8:19-cv-01335-JLS-KES (C.D. Cal., Southern Division) |
| **Date:** | Monday, August 9, 2021 9:32:23 PM |

Dear Alexander:

I write in response to your email below. At this stage of the proceedings, and to conserve parties' resources and focus expert reports and discovery, MVI is willing to narrow the claims for consideration to the following (independent claims in **RED**):

- 506 Patent: Claims **13**-16, 18-19, **23**-27, 29, 31, and 33.
- 819 Patent: Claims **1** and 5, **15** and 17-18.
- 338 Patent: Claims **1**-4 and **7**-9.

Regards,

Evan Finkel

**Evan Finkel** | Partner

Pillsbury Winthrop Shaw Pittman LLP

725 South Figueroa Street, 36th Floor | Los Angeles, CA 90017-5524

t +1.213.488.7307 | f +1.213.226.4058 | m +1.818.298.1195

evan.finkel@pillsburylaw.com | website bio

**From:** Alexander.Zeng <Alexander.Zeng@knobbe.com>
**Sent:** Tuesday, August 3, 2021 3:35 PM
**To:** Finkel, Evan <evan.finkel@pillsburylaw.com>
**Cc:** Pillsbury-MVI-Litigation <Pillsbury-MVI-Litigation@Pillsburylaw.com>; Lit MIBAL.001L <LitMIBAL.001L@knobbe.com>
**Subject:** Narrowing of Asserted Claims - MicroVention, Inc. v. Balt USA, LLC, 8:19-cv-01335-JLS-KES (C.D. Cal., Southern Division)

Counsel,

Now that the Court has issued its claim construction ruling and the case has progressed, we believe it would be appropriate for MVI to narrow the asserted claims. Such a narrowing would conserve both parties' resources and allow the case to proceed efficiently with expert discovery and other pre-trial deadlines.

Please let us know by August 9 whether MVI will continue to allege infringement of all of the currently asserted claims, or if there is a subset of the currently asserted claims that MVI will pursue in this matter.

To the extent MVI is unwilling to narrow its claims to a reasonable number at this stage, Balt

Exhibit 6
-176-

reserves all rights.

Thank you,

**Alexander Zeng**
Associate
Alexander.Zeng@knobbe.com
310-601-1261 **Direct**
**Knobbe Martens**
1925 Century Park East, Suite 600
Los Angeles, CA 90067
www.knobbe.com/alexander-zeng

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Service Desk at Tel: 800-477-0770, Option 1, immediately by telephone and delete this message, along with any attachments, from your computer. Nothing in this message may be construed as a digital or electronic signature of any employee of Pillsbury Winthrop Shaw Pittman. Thank you.

Exhibit 6
-177-

# EXHIBIT 7

1  Sheila N. Swaroop (SBN 203,476)
   Sheila.Swaroop@knobbe.com
2  William O. Adams (SBN 259,001)
   William.Adams@knobbe.com
3  KNOBBE, MARTENS, OLSON & BEAR, LLP
   2040 Main Street
4  Fourteenth Floor
   Irvine, CA 92614
5  Phone: (949) 760-0404
   Facsimile: (949) 760-9502
6
7  Nicholas A. Belair (SBN 295,380)
   Nicholas.Belair@knobbe.com
8  KNOBBE, MARTENS, OLSON & BEAR, LLP
   333 Bush Street, 21st Floor
   San Francisco, CA 94104
9  Phone: (415) 954-4111
   Facsimile: (415) 954-4111
10
11 Alexander Zeng (SBN 317,234)
   Alexander.Zeng@knobbe.com
12 KNOBBE, MARTENS, OLSON & BEAR, LLP
   1925 Century Park East, Suite 600
   Los Angeles, CA 90067
13 Phone: (310) 551-3450
   Facsimile: (310) 551-3458
14

15 Attorneys for Defendant,
16 Balt USA, LLC

16                    IN THE UNITED STATES DISTRICT COURT

17              FOR THE CENTRAL DISTRICT OF CALIFORNIA

18                           SOUTHERN DIVISION

19 | | |
|---|---|---|
20 | MICROVENTION, INC., | ) | Civil Action No. |
| | ) | 8:19CV01335-JLS (KESx) |
| Plaintiff, | ) | |
21 | | ) | |
| v. | ) | **DEFENDANT BALT USA, LLC'S** |
22 | | ) | **SECOND SUPPLEMENTAL** |
| BALT USA, LLC, | ) | **RESPONSE TO PLAINTIFF'S** |
23 | | ) | **FIRST SET OF** |
| Defendant. | ) | **INTERROGATORIES (NO. 5)** |
24 | | ) | |
| | ) | **CONFIDENTIAL – ATTORNEYS** |
25 | | ) | **EYES ONLY** |
26 | | ) | |
| | ) | |
27 | AND RELATED COUNTERCLAIMS | ) | |
28

Exhibit 7
-178-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: July 30, 2021          By: */s/ William O. Adams*

Sheila N. Swaroop
William O. Adams
Nicholas A. Belair
Alexander Zeng

Attorneys for
Defendant/Counterclaimant,
Balt USA, LLC

- 10 -

Exhibit 7
-179-

# APPENDIX D-1

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 7
-180-

**CONFIDENTIAL – ATTORNEY'S EYES ONLY**

**U.S. Patent No. 10,076,338 Non-Infringement Claim Chart**

The non-infringement contentions set forth below are specific to Optima Coil System Products manufactured on or before June 14, 2021.

| Asserted Claims of '338 Patent | Non-infringement Contentions |
|---|---|
| **Claim 1** | |
| A detachable implant delivery system, comprising: | |
| a. a delivery device having a heater coil proximate a distal end of said delivery device; | The Optima Coil System does not meet this claim limitation literally or under the doctrine of equivalents at least because the heater coil of the Optima Coil System is located at the distal end of the delivery device, not proximate to the distal end, as shown in the annotated figure below. |
| b. a microcoil comprising a helical wire; and, | |
| c. a stretch-resistant member characterized by a single monofilament and connecting said delivery device and said microcoil; | |
| d. said stretch-resistant member passing through a lumen of said microcoil and being attached at a | The Optima Coil System does not meet this claim limitation literally or under the doctrine of equivalents at least because the stretch-resistant thread is attached to the delivery pusher at a |

Exhibit 7
-181-

**CONFIDENTIAL – ATTORNEY'S EYES ONLY**

### U.S. Patent No. 10,076,338 Non-Infringement Claim Chart

| Asserted Claims of '338 Patent | Non-infringement Contentions |
|---|---|
| first location near a distal end of said microcoil, at a second location near a proximal end of said microcoil, and at a third location near a distal end of said delivery device, such that said stretch-resistant member is located within said heater coil; | location proximal to the distal end of the delivery pusher, identified with a red circle in the figure below: |
| e. wherein a first portion of said stretch-resistant member is between said second location and said third location is tensioned so as to enhance breakage upon application of heat by said heater coil, | In its Order on Claim Construction (Dkt. 66), the Court construed the term "tensioned so as to enhance breakage" to mean "tension created by applying a pre-determined or pre-set force or displacement during assembly so as to reduce detachment time or temperature of the tether upon application of heat by said heater coil."<br><br>The accused Optima Coil System does not meet this claim limitation at least because any "tensioned" state of the stretch-resistant thread does not "reduce detachment time or temperature" of the stretch-resistant thread.  Further, MVI has not met its burden to show the stretch-resistant thread of the Optima Coil System is tensioned "so as to reduce detachment time or temperature of the tether upon application of heat by said heater coil."<br><br>As set forth in ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ This test showed "no correlation between the tension/displacement on the stretch resistance thread and disengagement time of the implant from the pusher" ▆▆▆▆▆▆▆▆  Thus, there can be no literal infringement of this claim limitation.  Nor can there be infringement under the doctrine of equivalents, at least because an assertion of equivalence against a system that lacks any causal relationship between the claimed "tensioned" state of the tether and implant detachment time would vitiate this claim limitation. |

Exhibit 7
-182-

**CONFIDENTIAL – ATTORNEY'S EYES ONLY**

### U.S. Patent No. 10,076,338 Non-Infringement Claim Chart

| Asserted Claims of '338 Patent | Non-infringement Contentions |
|---|---|
| f.  and wherein a second portion of said stretch-resistant member is isolated from the tension of said first portion so as to resist stretching and thereby retain an original configuration of said microcoil. | |
| **Claim 2** | |
| The detachable implant delivery system of claim 1, | *See* Claim 1 |
| wherein said stretch-resistant member is attached to said microcoil at said first location with a knot. | |
| **Claim 3** | |
| The detachable implant delivery system of claim 1, | *See* Claim 1 |
| wherein said stretch-resistant member is attached to said microcoil at said first location with adhesive bonding. | |
| **Claim 4** | |
| The detachable implant delivery system of claim 1, | *See* Claim 1 |
| wherein said stretch-resistant member comprises a material selected from the group consisting of polyolefin, polyethylene, polyolefin elastomers, ethylene-octene copolymer, biodegradable materials, PGLA, hydrogel, acrylamide, PEG, PET, nylon, amide-based polymers, block copolymers, PEBAX, polypropylene. | |
| **Claim 5** | *Not Asserted* |

Exhibit 7
-183-